IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

R STREET INSTITUTE
1212 New York Ave, NW #900
Washington, D.C. 20005

     Plaintiff

v.

ARTHUR RIZER d/b/a ARrow Consulting,
LLC
137 E. Reed Avenue
Alexandria, Virginia

RIZER CONSULTING, LLC
137 E. Reed Avenue
Alexandria, Virginia

    Serve On:
    Arthur Rizer
    137 E. Reed Avenue
    Alexandria, Virginia

    Defendants

Civil Court Action No:

---

## COMPLAINT FOR DELCARATIVE, INJUNCTIVE AND MONETARY RELIEF AND JURY DEMAND

Plaintiff R Street Institute ("RSI"), by and through its counsel, for its complaint against Defendants Arthur Rizer ("Rizer") and Rizer Consulting LLC ("Consulting") (together, "Defendants"), alleges as follows:

### NATURE OF ACTION

1. This is an action for (1) breach of the duty of loyalty, (2) tortious interference with business relations and prospective relationships, (3) violation of the Defend Trade Secrets Act, (4) violation of the Virginia Uniform Trade Secrets Act, (5) conversion, (6) fraudulent

misrepresentation, (7) negligent misrepresentation, (8) business conspiracy, (9) breach of contract, (10) fraud, (11) unjust enrichment, and (12) trademark infringement.  In addition, RSI brings this action under the United States Copyright Act and seeks a judgment declaring that it is the sole and rightful owner with the exclusive rights to use certain research, analysis and writings prepared for RSI as works for hire.

2.      This action arises out of a complex scheme Rizer designed to: (a) usurp corporate opportunities from RSI, his then-employer, for his own benefit; (b) defraud RSI into paying others to conduct his research and write his dissertation; (c) pass work product off as his own prepared by others, including his dissertation; (d) use RSI employees and resources to perform work diverted from RSI; and (e) engage in other fraudulent conduct, which resulted in Rizer promising the same or repackaging inappropriately similar RSI deliverables to multiple funding sources as part of his Side Work. Moreover, Rizer did not produce the deliverables, but instead hired others to prepare them under strict confidentiality agreements in order to prevent RSI and his clients from discovering the deception. He then passed the work off as his own, keeping the revenue that should have been paid to RSI.

3.      Through his repeated lies and misrepresentation, Rizer created and then fostered a culture of distrust among his RSI employees, isolating them from the organization and discouraging them (and in some cases, prohibiting them) from disclosing work performed for Defendants to RSI.   In this regard, Rizer targeted younger and less-experienced employees, conning them into writing his dissertation (under the guise that they were co-authoring a book to be published by, or at least for the benefit of, RSI) and performing work for Defendants' clients. In addition, when the work being performed for these outside clients increased the workload of his RSI team, Rizer fraudulently represented to RSI that he needed additional staffing in his

department to complete RSI work, convincing the organization to enter into contracts with third parties to provide this additional capacity. However, unbeknownst to RSI, these contractors were actually researching and writing Rizer's dissertation, at RSI's expense. As a result, RSI owns all work product relating to Rizer's dissertation, including the research, drafts, and any and all written products. RSI is therefore entitled to injunctive relief and monetary damages resulting from this unlawful conduct.

## PARTIES

4.      Plaintiff RSI, is an independent, non-partisan 501(c)(3) organization with a mission to support free markets and limited, effective government located at 1212 New York Avenue, N.W., Washington, D.C. 20005.  RSI is incorporated in the District of Columbia.

5.      Defendant Arthur Rizer is a former employee of RSI residing at 137 E. Reed Avenue, Alexandria, Virginia 22305.

6.      Rizer also does business as ARrow Consulting, LLC located at 137 E. Reed Avenue, Alexandria, Virginia 22305.  Upon information and belief, ARrow Consulting, LLC is not a legal entity.

7.      Rizer Consulting, LLC is located at 137 E. Reed Avenue, Alexandria, Virginia 22305. Upon information and belief, Rizer Consulting LLC is solely owned by Defendant Rizer.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 because Counts 3,11,12, and 14 arise under the Defend Trade Secrets Act, 18 U.S.C. §1836, *et seq.*, the United States Copyright Act 17 U.S.C. §101, *et seq.,* and the Lanham Act, 15 U.S.C. §1051 *et seq*. This Court has supplemental jurisdiction over the remaining causes of action because

they are so related to Counts 3,11,12, and 14 that they form the same case or controversy under Article III of the U.S. Constitution. See U.S.C. §1367.

9.      Personal jurisdiction is proper as Defendants reside and/or are incorporated in Virginia and regularly transact business in Virginia. Furthermore, upon information and belief, much of the unlawful conduct complained of herein occurred in Virginia.

10.      Venue is proper in this Court under 28. U.S.C. §1391 because Defendants reside and/or are incorporated in this Judicial District.  Furthermore, upon information and belief, much of the unlawful conduct complained of herein occurred in this Judicial District.

## FACTUAL ALLEGATIONS

11.      RSI is a nonprofit, nonpartisan, public policy research organization with a mission to engage in policy research and outreach to promote free markets and limited, effective government.

12.      RSI has a Criminal Justice and Civil Liberties program that produces original research and commentary on public policy related to all aspects of the justice system including, *inter alia,* policing, pretrial policy, sentencing, incarceration, juvenile justice, and reentry.

13.      As part of its work, RSI builds coalitions to expand bipartisan support for various policy proposals, including criminal justice and civil liberty reform, through a program of research, writing, and educational outreach to policymakers and other stakeholders.

14.      RSI receives funding for its work from (among other sources) other nonprofit organizations, foundations, and other groups or people it engages with to conduct policy research and outreach.

15.      On or about August 22, 2016, RSI hired Arthur Rizer as its Director of Criminal Justice Policy ("Director of CJ"). (Note: This department was later renamed "Criminal Justice and

Civil Liberties," which is how it is referred to now. However, Rizer was commonly referred to as "Director of CJ" until his departure and is referenced as such herein.)

16.     Rizer is licensed to practice law in Pennsylvania.

17.     In his role as Director of CJ, Rizer was an at-will employee.  Rizer was not an officer, executive or a member of the board of directors.  Nor did Rizer work as legal counsel to RSI.

18.     In his role as Director of CJ, Rizer led RSI's criminal justice and civil liberties team and helped set RSI's agenda on a number of issues relating to crime, corrections, civil liberties, and policing reform.

19.     RSI provided Rizer with an annual salary as well as benefits including, *inter alia,* health insurance, telemedicine, gym membership, disability insurance, life insurance, and tuition reimbursement.

20.     RSI hired Rizer, at least in part, because he claimed to be an expert in the field of criminal justice. In applying for this position, Rizer held himself out as having the skills, experience, and expertise to perform the role of Director of CJ.

21.     As the Director of CJ, Rizer's duties and responsibilities included, *inter alia,* management of RSI's criminal justice team; producing original research in the form of white papers and long-form policy articles; producing material for the popular press; conducting empirical research on issues related to criminal justice; fundraising for financial sustainability; appearing on podcasts, interviews, and radio; testifying for policymakers at the federal and state levels; meeting with federal and state level legislators and staff; and speaking on panels and at other events pertaining to criminal justice and civil liberties.

22.     As part of RSI's quality assurance policies, RSI has a team of fact-checkers and editors who review all work before it is published to ensure appropriate documentation.

23.     On August 19, 2017, Rizer signed RSI's Conflicts of Interest Policy and Disclosure form.  Per RSI's Conflict of Interest Policy, a "conflict of interest" includes an employee who is engaged in some capacity, or has a material financial interest in, a business or enterprise that competes with RSI.

24.     The RSI Conflict of Interest Policy requires employees to identify any potential conflict of interest. Upon being hired by RSI, Rizer identified three potential conflicts: (1) studying and teaching at Oxford University; (2) sitting on the Criminal Committee for the International Bar Association; and (3) advising and fundraising for Tower of Hope, a non-profit organization that raises money to train service dogs and pair them with disabled veterans.

25.     RSI's Conflict of Interest policy requires annual disclosures of any conflicts.

26.     Other than the initial disclosures noted above, Rizer never disclosed any additional conflicts to RSI.

27.     Although Rizer did not disclose any additional conflicts, he repeatedly violated the Conflict of Interest Policy throughout his tenure at RSI until his termination on January 11, 2021.

28.     As the RSI Director of CJ, Rizer owed a duty of loyalty to RSI during his employment with the organization.

29.     Unbeknownst to RSI, throughout his employment, Rizer repeatedly diverted work from RSI for Defendants' gain through improper means ("Side Work") and used RSI resources to perform this work, charging expenses related to this work to RSI.

30.     Rizer repeatedly violated his duty of loyalty to RSI by:

a.      Diverting corporate opportunities away from RSI for his personal gain, as well as the gain of Consulting;

b.      Misleading potential donors, clients, customers, and sponsors of RSI to obtain such work;

c.      Interfering with RSI's business opportunities;

d.      Using RSI resources, including employees, for Defendants' benefit and profit;

e.      Misleading RSI employees regarding RSI management and corporate opportunities; and

f.      Misleading RSI employees regarding actions he was purportedly taking on their behalf.

31.     Rizer engaged in fraudulent and other improper behavior during the course of his dealings with RSI including, *inter alia*:

a.      Misappropriating R Street work product and selling the same or similar as part of his Side Work without proper disclosure;

b.      Fraudulently inducing RSI to hire individuals to conduct the research for his Oxford dissertation;

c.      Fraudulently inducing RSI employees and consultants to ghostwrite his Oxford dissertation;

d.      Fraudulently inducing RSI employees to work on his dissertation under the guise that they were co-authoring a book for the benefit of RSI; and

e.      Expensing costs to RSI that Rizer sustained conducting work for the Defendants' benefit.

32.     Rizer repeatedly required RSI employees he supervised to perform work for the Defendants' benefit, without disclosing these relationships or business dealings to RSI.  Indeed, at least one RSI employee received a monthly retainer paid by Rizer to perform work solely for the benefit of Defendants.

33.     Rizer improperly transferred money he received from various sources among various of his accounts, and commingled said monies to pay for the ghostwriting and analysis others performed on Defendants' behalf.  For example, Rizer retained J.T. d/b/a JKT Enterprises, LLC and A.N.R. to produce certain work product without the knowledge of RSI.

34.     A.N.R. is a research and data scientist with a specialization in criminology who works as a research manager for a large city government's mayoral office and, according to Rizer, is one of his "closest friends."

35.     J.T. is a former Department of Justice attorney who served prison time for child sexual abuse. Upon information and belief, as a result of that conviction and subsequent misconduct, J.T.'s bar license was suspended and/or revoked in some or all of the jurisdictions in which he was licensed to practice.

36.     In September 2019, J.T. emailed J.K., the then-RSI Government Affairs Manager and Criminal Justice Manager, seeking opportunities to work in criminal justice reform. J.K. forwarded the email to Rizer.

37.     Rizer asked RSI's President if RSI would hire J.T. The request was denied and Rizer was told, unequivocally, that RSI would not work with J.T. because of the specific nature of his conviction.

38.     Instead, on or about October 15, 2019, Rizer entered into a personal contract with J.T. d/b/a J.K.T. Enterprises, L.L.C. ("J.T. Agreement") to ghostwrite certain RSI work product

and prohibited J.T. from disclosing this arrangement to others without Rizer's prior approval.  The scope of work was to "engage with client on work related to criminal justice reform with writing, implementation and advocacy."

39.    Rizer repeatedly conspired with J.T. to use Rizer's position at RSI to target and divert work from RSI and to use its resources in service of their joint venture. By entering into agreements with J.T. that prohibited him from disclosing the work he was performing for Rizer and Consulting, J.T. and Rizer defrauded their clients into believing Rizer and/or Consulting had the skills and expertise to produce the required work product when, in fact, J.T. produced this work product.

40.    The conspiracy with J.T. began in or around October 2019 and continued throughout the remainder of Rizer's employment with RSI.  For example, on December 11, 2019, J.T. emailed Rizer regarding a proposal to obtain additional work stating:

> Man, this would be a legacy project if it could be pulled off. I gave the proposal a quick read and made a few editing changes. . . .This would be super-cool to work on (and maybe we'd get comped tickets to, I don't know, the world championship of a major sports league held every year and marked by Roman numerals?) Thanks for the conversation. I'll be in touch about my future. Again, to be clear, I CAN take more work from you, and would be happy to do so. The last four years I worked as a lawyer, I never *billed* less than 2800 hours. We could write a helluva lot of proposal [sic] before we got to those hours, so have no fears about my capacity.

41.    Upon information and belief, Rizer's sharing of the aforementioned proposal with J.T. constitutes a trade secrets violation, as the proposal in question was one that RSI had previously prepared and provided to an RSI donor for the procurement of additional work.  Indeed, RSI received funding for that work from that donor. Rizer then copied large portions of that RSI proposal to sell a similar work product to a potential client of his own.

42.     On or about February 8, 2020, it appears that J.T. realized that the amount of work Rizer was diverting from RSI under the guise that he could perform such work himself was too much for one person to credibly claim. Accordingly, on or about that date, J.T. emailed a draft proposal from ARrow Consulting, LLC to Rizer stating: "You'll see I wrote myself into this, largely to make this seem less like a one-man band, which does not seem credible, but write me out at your pleasure. After re-reading, I think – man, this is ambitious. But shoot for the moon, I guess."

### Organization A

43.     "Organization A" is an organization dedicated to criminal justice reform and eradicating laws and policies that perpetuate injustice in the United States. This mission falls squarely within the mission of RSI.

44.     In or about June 2019, Rizer entered into a contract with Organization A to prepare testimony and speak on its behalf in Pennsylvania ("Organization A Side Work").

45.     The spirit of this Organization A Side Work fell squarely within the scope of Rizer's duties as RSI's Director of CJ. Accordingly, this opportunity should have been disclosed by Rizer to RSI so that it could determine whether the work would qualify under its (h) election before he diverted it.

46.     Rizer did not disclose the Organization A Side Work to RSI.

47.     Rizer received payment from Organization A for the Organization A Side Work.

48.     Rizer used RSI resources to perform the Organization A Side Work.

49.     J.K. was the Manager, Government Affairs; Manager, Criminal Justice & Civil Liberties of RSI.  In that role, J.K's responsibilities included, *inter alia,* traveling to states to help

propose public policies related to policing and drafting written testimony on criminal justice reform issues.

50.     Rizer supervised J.K. in her work at RSI.

51.     Rizer used RSI employees, including J.K., to perform Organization A Side Work for Defendants' benefit. For example, J.K. drafted certain testimony regarding criminal justice reform as part of Organization A's Side Work.

52.     From June 24, 2019 through June 25, 2019, J.K. drove Rizer to Pennsylvania to perform—during regular working hours—work for Organization A that should have been done in their capacity as RSI employees. Instead, Rizer and/or Consulting was paid directly by Organization A for this work.

53.     Rizer and J.K. represented expenses incurred while performing this Organization A Side Work as RSI expenses and submitted them to RSI for reimbursement. RSI reimbursed Rizer and J.K. for these expenses.

54.     In furtherance of his Organization A Side Work, Rizer submitted written testimony in support of certain legislation pending before the Pennsylvania General Assembly, using RSI's letterhead and trademark.

55.     Rizer fraudulently charged time to RSI for the Organization A Side Work.

56.     Rizer paid J.K. for the work she performed on the Organization A Side Work while J.K. billed her time to RSI for the same work, representing that this was work performed during the scope of her duties and responsibilities with RSI. In addition to receiving her RSI salary, J.K. was paid by Rizer for the Organization A Side Work.

57.     Rizer encouraged J.K. to conceal the Organization A Side Work from RSI.

58.     Rizer instructed J.K. to bill her Organization A Side Work time and expenses to RSI, notwithstanding the fact that Rizer and/or Consulting was paid by Organization A for such work.

59.     On or about Tuesday, September 19, 2019, employee J.J. of Organization A had discussions with her team about retaining Rizer for a longer-term contract to help with writing op-eds, a white paper, and other docs geared toward a right-of-center audience.

60.     On or about Friday, November 8, 2019, Rizer started receiving a monthly retainer from Organization A in the amount of $6,000 (Six thousand dollars and zero cents).

61.     On or about Monday, February 17, 2020, Rizer took J.J. to lunch at Blackwall Hitch in Alexandria, Virginia to discuss additional opportunities to work together.  Rather than soliciting work from Organization A for the benefit of RSI, Rizer instead suggested that Organization A contract with Consulting, again diverting work that could have been performed by RSI—and at RSI's expense, as he expensed the cost of this lunch to RSI.

62.     In July 2020, Rizer was made aware of additional opportunities to work for Organization A that fell squarely within the work RSI performs, and rather than develop the work for RSI, Rizer again diverted the work for his own personal gain.

63.     On or about July 22, 2020, during a telephone call with E.H. and J.J. of Organization A, Rizer discussed an additional, significant deliverable for which Organization A wanted to engage a consultant.  During the call, Rizer acknowledged that he could not perform the work himself. Although this work fell squarely within the work RSI typically performs, as well as within the scope of Rizer's duties and responsibilities with RSI, Rizer diverted the work away from RSI by suggesting the use of A.N.R., an individual, independent contractor with whom RSI

was already under contract for RSI deliverables, to perform some of this work. Had Rizer disclosed this opportunity to RSI, RSI could and would have performed this work for Organization A.

64.     Knowing that he lacked the requisite skills, experience, and resources to perform the Organization A Side Work, Rizer retained A.N.R. and J.T. to produce the Organization A deliverables. For example, on October 22, 2019, J.T. sent Rizer a memorandum titled "Closing the Supervision to Prison Pipeline: Proposed Tier One States and Legislative Reforms for the 2020 Cycle." On October 31, 2019, J.T. sent Rizer a "two-pager" titled "Community Supervision Reform: A Two-Year Gameplan in Seven 'Tier One' States."  On November 5, 2019, J.T. emailed Rizer an article entitled "Policing as a Profession: Reducing Excessive Force Through Education, Training and Transparency." On November 12, 2019, J.T. sent Rizer a draft white paper entitled "Seeking Success: Why Prosecutors Should Care About Community Service Reform." J.T. submitted invoices to Rizer for these deliverables.

65.     On July 22, 2020, Rizer introduced J.T. and A.N.R. to each other via an email titled "FLASH FLASH – shit ton of work but shit ton of money." Rizer further stated: "My client at [Organization A] wants us to send in a proposal on that data project but they want the product by early AUG!!!!!!!!!!! But are willing to pay a fortune for it." Upon information and belief, this project fell squarely within the scope of Rizer's duties and responsibilities with RSI.

66.     Upon information and belief, Rizer performed this work and was paid for it on the side. Moreover, Rizer used RSI resources to perform the work and did not disclose it, despite the fact that it could and would have been performed by RSI, if he had not diverted it.

67.     Upon information and belief, in order to use RSI funds to compensate A.N.R. for this work for Organization A, Rizer intentionally misrepresented to RSI the needs of the CJ department so that RSI would enter into a consulting agreement with A.N.R. However, A.N.R. did

not perform work for RSI, but instead, RSI unwittingly paid A.N.R. to work on Rizer's deliverables for Organization A.

68.     Upon and information and belief, Organization A did not know Rizer's actions were fraudulent, unlawful and a breach of his duty of loyalty to RSI.

**Organization B**

69.     Organization B is a bipartisan organization that supports policymakers and entrepreneurs who oppose special interests in defense of the common good. One of Organization B's focuses is on criminal justice with an aim at developing policies for reducing return-to-incarceration rates and pursuing criminal justice reform. This mission falls squarely within the mission of RSI.

70.     In or around May 2019, Rizer began performing work for Organization B ("Organization B Side Work").  RSI could and would have been able to perform the work included in the Organization B Side Work had Rizer made RSI aware of Organization B's needs.

71.     The Organization B Side Work fell squarely within the scope of Rizer's duties in his role as Director of CJ.

72.     Upon information and belief, Organization B Side Work included, *inter alia,* producing draft legislation relating to criminal justice reform, cultivating relationships with state lawmakers in order to obtain sponsorship for bills, providing testimony in support of legislative initiatives, and organizing outside advocacy groups to support those initiatives.

73.     Rizer did not disclose the Organization B Side Work to RSI. Had Rizer disclosed to RSI the opportunity presented by the Organization B Side Work, it could and would have performed that work.

74.    In diverting the work from RSI, Rizer made material misrepresentations to RSI about the potential revenue stream, while submitting expenses to RSI for travel relating to his efforts to divert and perform this work including, *inter alia,* a trip to San Francisco in August 2019.

75.    On or about May 15, 2019, Rizer submitted a Letter of Interest to Organization B ("LOI").  Per this LOI, the Scope of Work included, *inter alia,* working during the 2019 California State Assembly session on issues relating to prison populations and parole. Part of this work involved drafting legislation known as "The Rebound Act."

76.    Rizer stated in the LOI that he "[has] the resources to lead a project to advance legislation in California aimed to fundamentally change the way the state deals with parole." Those resources were RSI resources, not Rizer's.

77.    Rizer further stated in the LOI that he had a "team" and that "travel to California will be critical for the team." This "team" consisted of RSI employees, though Rizer never disclosed this LOI or potential work to RSI.

78.    Had RSI been engaged in this work, it would have assigned employees with relevant experience to produce any Organization B deliverables. One of those employees would very likely have been J.K.

79.    Upon information and belief, Rizer realized he did not have the skills or experience to perform the work he proposed to Organization B.  Accordingly, he identified RSI employee J.K. as someone who was part of his "team."

80.    Although Rizer identified J.K. in the Organization B LOI, he did not disclose that J.K. was an RSI employee.

81.    In diverting the Organization B Side Work from RSI, Rizer leveraged his position at RSI as a way to reduce expenses he charged to Organization B by charging those expenses to

RSI. Specifically, Rizer promised Organization B that he and J.K. "already travel to CA extensively, which will drive down the cost." Rizer and J.K.'s "extensive" travel to California was in performance of their respective duties for RSI, and was funded by RSI.

82.     The LOI shows Rizer's intent to charge time spent and expenses incurred in the performance of Organization B Side Work to RSI.

83.     Understanding that he did not have the experience or skillset to perform the Organization B Side Work, on or about May 18, 2019, Rizer entered into a contract with J.K., an RSI employee, to assist Defendants in performing the Organization B Side Work ("J.K. Side Contract").

84.     Per the J.K. Side Contract, Rizer hired J.K. to engage with California lawmakers, draft legislation, cultivate relationships with state lawmakers, provide testimony in support of certain bills, and plan events including briefings and panel discussions. This work fell squarely within the scope of J.K.'s duties and responsibilities for RSI.

85.     Per the J.K. Side Contract, Rizer was the "Client" and J.K. was the "Contractor."

86.     Paragraph 20 of the J.K. Side Contract prohibited J.K. from disclosing her work for Rizer on the Organization B Side Work to RSI. Specifically, that provision provides:

> Contractor will not disclose she is working on this project to any individual except for [A.P.], her fiancé, without prior approval from Client.

The J.K. Side Contract was in direct conflict with Rizer and J.K.'s duty of loyalty to RSI and duty to disclose the existence of the Organization B Side Work to RSI.

87.     Rizer intentionally diverted the Organization B Side Work from RSI and prohibited an RSI employee, who he supervised, from disclosing the existence of this work to RSI.

88.     By retaining J.K. to perform the Organization B Side Work, Rizer diverted her time and attention away from RSI matters and donors.

89.     According to Rizer, the Organization B Side Work was "a ton of work" and Organization B was "very generous" with him.  Whatever amounts were paid to Rizer should have been paid to RSI.

90.     On or about August 11, 2019 through August 13, 2019, Rizer and J.K. attended an Organization B gathering in San Francisco. Rizer and J.K. billed their time for attending this event to RSI and expensed costs associated with travel and lodging to RSI. In addition, Rizer invited another RSI employee (N.B.) whom he supervised to attend. N.B. also attended this event and billed her time and expenses to RSI.

91.     Before attending the event in San Francisco, Rizer disclosed to another RSI employee that he and J.K. would be attending the Organization B event stating: "We were invited by [J.L.], CEO of [Organization B] for a gathering on criminal justice reform. I am not interested in seeking funding from Organization B per se . . . I do not think they are a great lead. . . .BUT I think the 'gathering' will have other players in the funding world." However, Rizer was already being paid by Organization B and thus intentionally misled RSI about the reasoning Organization B was purportedly "not a great lead."

92.      Although Rizer's RSI employees knew that he was doing this work on the side, Rizer purposely misled them, telling them there was no conflict of interest in performing this work. Upon information and belief, Rizer misled them so that they would not disclose the conflict of interest or the Organization B Side Work to RSI.

93.     Part of Rizer's strategy of deception involved telling his RSI employees that RSI could not get this work because of "bad blood" between Organization B's Founder and RSI's President.

94.     Contrary to this statement of Rizer's to his employees, RSI's President and Organization B's Founder had never met and there was no "bad blood" between them. Accordingly, RSI could and would have been able to perform this work on behalf of Organization B.

95.     Rizer consistently used RSI resources and staff to perform the Organization B Side Work, without disclosure that the work was not being performed for the benefit of RSI. This resulted in his RSI staff being over-worked and stressed because of the non-RSI work that was added to their RSI duties and responsibilities.

96.     Rizer leveraged his RSI team's resulting frustration to run a smear campaign against RSI leadership and to purposefully isolate his staff from the organization, telling his staff—and at times, his supervisor—that the excessive workload was as a result of RSI pressuring him to do more with less resources and further telling his staff that he had requested additional resources from RSI to cover this workload, but that he had been denied.

97.     For several years before Rizer began performing Organization B Side Work, RSI had been attempting to cultivate a relationship with Organization B, Organization B's Founder and related entities on behalf of RSI.

98.     Upon information and belief, Rizer purposely misled Organization B telling it that RSI required the payment of overhead in its agreements with donors and grantors, and that RSI would not waive this requirement. Rizer intentionally misrepresented this information in order to get a competitive advantage over RSI and to usurp the Organization B opportunity for his own personal gain.

99.     After entering into an agreement to perform the Organization B Side Work, Rizer used RSI resources for the performance of this work and as a platform to publish it.

100.    When other RSI employees had potential sources of work from Organization B, Rizer declined the work on behalf of RSI, claiming that his department was "maxed out," and then acted to procure the additional work for himself.

101.    Upon information and belief, Rizer billed time he spent and expenses he incurred in the performance of the Organization B Side Work to RSI.

102.    After completing the May 2019 Organization B Side Work, in or about October 2019, Rizer entered into another agreement with Organization B for additional Side Work.

103.    Per the October 2019 agreement for Organization B Side Work, Rizer agreed to work for Organization B for 20 hours per week for work that fell squarely within the scope of Rizer's duties and responsibilities as RSI's Director of CJ.

104.    Rizer did not disclose the October 2019 Organization B opportunity to RSI. Instead, he diverted the opportunity for Defendants' benefit. Had Rizer disclosed this opportunity to RSI, it could and would have performed this work for Organization B.

105.    Upon information and belief, Rizer earned a monthly retainer from Organization B of at least $4,000. This was in addition to the other monthly retainers Rizer earned from other work he diverted from RSI.  It was also in addition to his salary paid by RSI.

106.    The October 2019 Organization B Side Work included, *inter alia,* a research project toward producing a white paper and exhaustive literature review, building relationships in Georgia, preparing multiple writing projects, meeting with government agencies and legislative offices to advocate for certain legislative initiatives, and testifying before the legislature in support of these initiatives. This work fell squarely within the scope of Rizer's duties and responsibilities for RSI. Had Rizer disclosed this opportunity to RSI, it could and would have performed this work for Organization B.

107.    Indeed, the October 2019 Organization B Side Work was so substantial that Organization B asked Rizer how he "would have enough time to do an extra 20 hours a week for [it], considering [his] responsibilities at R Street and elsewhere."

108.    Rizer knew that he lacked the skillset, experience and resources to perform this Organization B Side Work on his own. This is evidenced by the fact that Rizer often forwarded communications he received from Organization B to others, including J.K., to ghostwrite responses for him, which he then passed off as his own. For example, on January 22, 2020, Organization B wrote to Rizer, at his RSI email address, asking him to provide analysis on an issue. Rizer responded "absolutely" and then forwarded the email to J.K. asking: "Can you look at this and write me a good response?"  Upon information and belief, J.K. provided the analysis and draft response, which Rizer passed off as his own. This happened repeatedly and prevented J.K. from performing her duties and responsibilities on behalf of RSI.

109.    Rizer also engaged J.T. d/b/a J.K.T. Enterprises, LLC to ghostwrite work for Rizer to advance the Organization B Side Work.  J.T. is not an RSI employee but had reached out to RSI about employment possibilities given his interest in the criminal justice field. Instead, acting in his personal capacity, Rizer hired J.T. to ghostwrite Rizer's work and prohibited J.T. from disclosing this arrangement to others, including RSI.

110.    Understanding that he lacked the skills and experience to perform the Organization B Side Work without RSI, upon information and belief, Rizer paid J.T. a monthly retainer to ghostwrite and perform the Organization B Side Work including, *inter alia*, drafting various work products on policing and other matters.

111.    Upon information and belief, Rizer frequently engaged in unethical scholarly practices that would not have been acceptable to RSI. He did so most notably in two ways: First,

acting on his reputation as a subject matter expert, Rizer often 'baited and switched' RSI, its donors and his own clients by passing off work and original analysis as his own when, in fact, it had been written by others. Second, he often engaged in 'self'-plagiarism by attempting to superficially repackage and repurpose RSI existing work that had already been published and produced for others and representing it as novel. For example, on September 12, 2020, using his RSI email address, Rizer emailed J.K., providing two articles and instructing her to take the first article and model in the same tone and format as the second article noting: "[I]t needs to be different enough not to spark concern that it's a cut and paste job."

112.    While performing the October 2019 Organization B Side Work, Rizer continued to use RSI resources to perform the work for his personal gain including, *inter alia*:

a.      Using his RSI email address, which included the RSI trademark as part of his signature block, to correspond with RSI contacts to gain support for the Organization B legislative initiatives;

b.      Using RSI employees to schedule meetings for his Organization B Side Work;

c.      Using J.K. to perform Organization B Side Work, during RSI business hours, preventing her from performing her RSI duties and responsibilities;

d.      Using other RSI employees he supervised, including E.M., to advance Organization B's legislative initiatives;

e.      Using his RSI email, which included the RSI trademark as part of his signature block, to communicate with Organization B on the Organization B Side Work; and

f.      Using RSI employees to assist in finding sponsors for legislative initiatives and make additional contacts and introductions as part of the Organization B Side Work.

113.     Rizer relied on RSI's resources to solicit additional work from Organization B.  For example, on November 1, 2020, Rizer emailed J.K., using his RSI email address, stating: "[J.L] from [Organization B] (the billionaire who is [C.S.'s] boss) is getting cold feet on CJ and especially police reform. He asked for a call today on policing (right when the Seahawks/49ers game starts) – can you let me know where we stand on any police reform this year, what reform we are looking at, and status? Especially police union stuff." In response, J.K. provided an overview of RSI's prioritization of state policy targets and RSI's connections to them – all of which constituted RSI's trade secrets and proprietary information.  In this way, J.K. and Rizer misappropriated RSI's trade secrets and used RSI resources to secure additional work from Organization B for their personal benefit. Moreover, Rizer and J.K. took no steps to safeguard this confidential information from further publication.

114.     Rizer frequently performed work for Organization B during regular business hours during which he should have been performing his RSI duties and responsibilities. For example, in November 2020, Rizer attended a multi-day retreat for Organization B in Austin, Texas, which included two full days of strategy sessions.

115.     Upon and information and belief, Organization B did not know Rizer's actions were fraudulent, unlawful and a breach of his duty of loyalty to RSI.

## Organization C

116.     Organization C is an organization that promotes innovative change through legal representation, policy advocacy, education and coalition building. Organization C's mission falls squarely within the mission of RSI.

117.     On August 7, 2020, an RSI employee emailed Rizer regarding an opportunity to work with Organization C noting that: "They want a local center-right partner who also has some

legislative experience." Rizer rejected the opportunity for RSI stating: "It is an issue we really care about but don't have specific funding for and honestly, we are completely maxed out." This statement was false and was intended to convince RSI employees that RSI did not have the resources to take on the work when, in fact, it did.

118.    After advising the RSI employee that RSI was "maxed out" and could not take any work from Organization C, Rizer emailed J.K. saying, "let's engage." This demonstrates Rizer's intention to divert this work from RSI for his personal benefit.

119.    It is unknown whether Rizer or Consulting engaged or entered into an agreement with Organization C, or performed any work for Organization C.  The opportunity to perform work for Organization C is believed to be well within the scope of RSI's mission. Had it known of this opportunity, RSI would certainly have pursued engagement with Organization C.

120.    Upon and information and belief, Organization C did not know Rizer's actions were fraudulent, unlawful and a breach of his duty of loyalty to RSI.

### Organization D

121.    Organization D is a 501(c)(4) action group that works across disciplines to raise awareness of key justice issues and the need for criminal justice reform. Organization D develops and furthers bipartisan legislation, regulations, and policies that advance a more just society. Although Organization D's (c)(4) designation means that it operates more as an advocacy group than RSI does, its mission aligns squarely with RSI's and RSI's (c)(3) "h election" allows it also to advocate in certain targeted, mission consistent circumstances.

122.    Upon information and belief, Organization D contacted Rizer, through his RSI email, with opportunities to work with Organization D. When presented with this opportunity, Rizer, through his RSI email, which included the RSI trademark as part of his signature block,

identified Consulting to perform the work instead of RSI, again diverting work from RSI for his personal benefit.

123.     Upon information and belief, in or around January 2020, Rizer began working with Organization D ("Organization D Side Work"). The Organization D Side Work fell squarely within the scope of his duties and obligations as RSI's Director of CJ and included, *inter alia,* drafting a use of force bill. Rizer was paid a monthly retainer from Organization D and/or its affiliated entity.

124.     The Organization D Side Work is work RSI could and would have performed and, in so doing, would have assigned someone with experience in drafting legislation to work on this deliverable.

125.     Instead, Rizer, who lacked the expertise to perform this work on his own, repeatedly relied on RSI resources and employees, without disclosure to RSI. Moreover, Rizer hired third parties to ghostwrite this work, and then delivered the work product, through RSI emails, under the guise that it was his own. For example, on January 21, 2020, J.T. emailed Rizer a draft bill entitled "Reducing Excessive Use of Force by Law Enforcement Act of 2020." Upon information and belief, Rizer forwarded this bill to Organization D, claiming it was his work product. This work fell squarely within the scope of work RSI typically performs and RSI employs individuals with the requisite skills to draft this type of legislation.

126.     On June 4, 2020, Rizer forwarded the client's edits to J.T., instructing him to edit the bill and "ensur[e] I do not sound like a red neck [sic] and use the term 'mental illness.'" In addition, Rizer advised J.T. that "by next WED we need like 3 op-ed [sic] done – they can all be very close (so long as not plagiarized) to each other – they will be in support of the bill."

127.     In or about June 2020, Defendants entered into a contract with Organization D, diverting work from RSI for his personal benefit ("June 2020 Organization D Contract"). Rizer did not notify RSI of this opportunity. Upon information and belief, Rizer received a $5,000 monthly retainer from Organization D. The work Rizer was contracted to perform fell squarely within his duties and responsibilities at RSI. Had Rizer disclosed this opportunity to RSI, it could and would have performed this work for Organization D.

128.     In addition to diverting business opportunities away from RSI, the June 2020 Organization D Contract gave rise to additional conflicts. For example, Rizer represented that he was not engaged in an employment relationship with any company whose business involved products or services proposed or in development by Organization D. Given his employment with RSI, Rizer's representation was false.

129.     Rizer never disclosed the Organization D Side Work to RSI.

130.     Rizer sought RSI support for Organization D initiatives without disclosing his involvement, again using RSI as the platform for his agenda and personal gain.

131.     Rizer used his position at RSI as leverage to create a coalition of support for the draft legislation produced as part of the Organization D Side Work.

132.     Rizer intentionally misled RSI employees that this Organization D Side Work was an RSI deliverable in order to use RSI resources stating: "When this bill drops it will be priority #1 for my team with all-hands thinking about ways to support it."

133.     Because this was not an RSI deliverable, when Rizer attempted to use RSI as a platform to publish and solicit support for the bill, RSI employees were not familiar with it. When RSI employees asked for additional information, Rizer responded that it was "embargoed," again using RSI resources but intentionally hiding information from RSI.

134.     Rizer continued to use RSI resources for the Organization D Side Work by having RSI employees he supervised perform the Organization D Side Work.

135.     In June 2020, RSI had an opportunity to support a different, but similar, proposed legislation to the Organization D bill. Aware of the conflict, Rizer instructed J.K. to provide the Organization D draft legislation to RSI's President since Organization D would "kill" Rizer if RSI supported a different, competing bill. In so doing, Rizer again intentionally diverted opportunities from RSI, failed to disclose the Organization D Side Work, and instructed an employee he supervised to cover his tracks.

136.     Upon and information and belief, Organization D did not know Rizer's actions were fraudulent, unlawful and a breach of his duty of loyalty to RSI.

## Organization E

137.     Organization E is a national civil rights organization whose mission is to secure political, educational, social, and economic equality of rights in order to eliminate race-based discrimination and ensure the health and well-being of all persons. Some of Organization E's initiatives involved addressing inequalities with regard to race and incarceration. This mission falls squarely within RSI's mission.

138.     In July 2020, Rizer entered into an agreement with Organization E to research and write a white paper dealing with the intersection of race and incarceration with the opioid crisis, to write an op-ed, and coordinate and host a leadership summit on this same subject ("Organization E Side Work"). The Organization E Side Work falls squarely within the scope of Rizer's duties and responsibilities for RSI. Had RSI been made aware of the Organization E Side Work, it could and would have performed this work.

139.    Rather than having RSI contract with Organization E, Rizer diverted the work for his personal benefit noting in an email: "If I am doing all the work I will take the check."

140.    Per the Organization E Agreement, Rizer was to be paid $20,000 for the Organization E Side Work.

141.    The Organization E Side Work involved working directly with an existing RSI donor.

142.    As part of the Organization E Agreement, Rizer agreed that the leadership summit promised as part of the deliverables in this stream of Organization E Side Work would be branded by RSI and that products from the project would be supported and promoted by RSI. Rizer never disclosed the Organization E Side Work or the guarantees he made regarding RSI—or the use of its resources—to RSI.

143.    Rizer used RSI resources and employees to perform work on the Organization E Side Work including, *inter alia*, using RSI staff to make introductions and obtain support for the cause.  For example, on August 14, 2020, J.K. emailed an RSI contact, inviting him to a roundtable to discuss the intersection of the continuing opioid crisis and criminal justice reform, using RSI email during regular business hours.

144.    Rizer did not disclose the Organization E Side Work to RSI and personally benefited from the work. Had the opportunity been disclosed to RSI, it could and would have contracted with Organization E for the work.

145.    One of the deliverables for the Organization E Side Work was an original white paper on race, sentencing and opioids. Realizing that he lacked the skills, experience, and resources to fulfill the requirements of this aspect of the Organization E Side Work, upon information and belief, Rizer paid J.T. $2,000.00 to ghostwrite the article, but represented that work as his own

telling Organization E: "I have to say this turned out really great and is one of the best pieces I have written (sorry to brag)."

146.    In addition, Rizer used RSI resources and staff to help plan a leadership summit as part of the Organization E deliverables. Rizer was included as a leader of the summit with his RSI title, RSI email and contact information, and purported to be acting on behalf of RSI, despite his failure to disclose this Organization E Side Work to RSI.

147.    Upon and information and belief, Organization E did not know Rizer's actions were fraudulent, unlawful and a breach of his duty of loyalty to RSI.

### Kick-Backs

148.    In the summer of 2020, Rizer began corresponding with an existing RSI grantor about additional work, using RSI email in his capacity as RSI Director of CJ. The grantor sought assistance in narrowing policy targets and priority states for the upcoming 2021 legislative sessions relating to police accountability.

149.    Rizer instructed an RSI employee he supervised, E.M., to prepare a proposal for this project and then later, on or about August 6, 2020, Rizer paid E.M. directly for doing so.

150.    On July 22, 2020, Rizer emailed his RSI supervisor about Rizer's desire to enter into a consulting relationship with this existing RSI grantor, noting: "There would be no 'products' beyond my brain power." Rizer asked that RSI allow him to be paid directly for this work with a current donor. Rizer's supervisor unequivocally denied this request, instead instructing Rizer that RSI would enter into a contract with this donor.

151.    Rizer then repurposed the proposal E.M. had written for his consultancy as an RSI proposal and submitted it to the grantor.

152.     Rizer continued conversations with the grantor to fund the work and developed a scheme whereby he could profit from the work, despite RSI's clear position that this was prohibited and a conflict of interest.

153.     On September 9, 2020, the grantor advised Rizer that it had provisionally awarded the work to RSI.

154.     On September 15, 2020, the grantor submitted a proposed Agreement to Rizer for RSI.

155.     Rizer represented to RSI that it needed to hire a specific contractor, A.N.R., to assist with the work on this project. RSI had previously contracted with A.N.R. for certain deliverables. Based on Rizer's representation, RSI entered into an additional agreement with A.N.R. to produce certain deliverables on the grant ("A.N.R. Agreement"). In the A.N.R. Agreement, Rizer expressly represented that A.N.R. had the "competence, skill, and experience necessary to undertake the obligations imposed by this Agreement."

156.     Upon information and belief, A.N.R. was merely a front who provided an end-run for Rizer to personally profit from the grant. For example, on October 5, 2020, Rizer forwarded an email to A.N.R. referencing, "what we talked about on the phone." Upon information and belief, this phone call was part of a scheme to defraud RSI into paying A.N.R., who then paid some or all of the amounts he received from RSI to Rizer.

157.     On or about October 6, 2020, Rizer emailed the grantor to check-in on the status of the contract, noting that he had frontloaded the work and needed to pay his subcontractor. Upon information and belief, this was an untrue statement and the contractor had not yet been retained or conducted any work. The grantor then re-sent the proposed agreement.

158.    Upon information and belief, although A.N.R. billed RSI for work under its agreement with A.N.R., the work was actually performed in-house by RSI staff, including but not limited to J.K. and Rizer, but not A.N.R.

159.    Upon information and belief, after receiving payment from RSI, A.N.R. paid Rizer, in direct violation of the conflict of interest policy and in furtherance of Rizer's scheme to defraud RSI by using A.N.R. as a pass-through for funds Rizer could not receive directly.

160.    Payment to A.N.R. was conditioned upon approval by Rizer of the invoices. Rizer approved the invoices.

161.    On November 11, 2020, A.N.R. emailed an Electronic Funds Transfer Enrollment Form to Rizer for completion. Upon information and belief, this form was needed so that A.N.R. could deposit money from his bank account into Rizer's bank account. Rizer forwarded this to his wife instructing her that they: "need this filled out to get timely deposits by A.N.R."

162.    On or about November 16, 2020, A.N.R. submitted an invoice for $20,000.00 to RSI. Rizer approved the invoice and RSI paid A.N.R. $20,000.00. In total, RSI paid A.N.R. $30,000.00 on this specific A.N.R. Agreement.

163.    A.N.R. submitted additional invoices to RSI, which were approved by Rizer and paid by RSI. Upon information and belief, A.N.R. then forwarded most of the amounts paid to him by RSI back to Rizer.

164.    On or about January 11, 2021, RSI terminated Rizer's employment.

165.    On or about January 25, 2021, A.N.R. terminated his agreement with RSI stating, in essence, that he lacked the skills and experience to perform the project without Rizer, which was contrary to what A.N.R. represented in the A.N.R. Agreement. To be clear, had A.N.R. not

been able to complete the deliverables without Rizer, RSI would not have engaged A.N.R. to perform the work.

166.    RSI asked A.N.R. to provide the deliverables for which he was purportedly paid. A.N.R. produced documents, which upon information and belief, were documents RSI employees largely created, not A.N.R.

167.    Upon information and belief, A.N.R. and Rizer conspired to defraud RSI.

## Ghostwriting/Plagiarism

168.    Rizer engaged in a complex scheme to use the expertise, writing, and analysis of others and to pass that work off as his own, often unbeknownst to his coauthors, his university, his employer, and his clients. For example, upon information and belief, Rizer hired J.T. to write and provide original analysis for his Side Work and Oxford dissertation.

169.    Upon information and belief, Rizer paid J.T. to write deliverables Rizer was responsible for writing and then took credit for J.T.'s work without notifying RSI that he was not, in fact, the author. Based upon Rizer's representation that the work he was producing was his own work product, RSI published the works under Rizer's name without giving any credit to J.T.

170.    For example, in May 2020, Rizer purportedly co-authored a white paper with E.M. for publication in a national journal. Rizer represented to RSI and to coauthor, E.M., that he had written "his" portions of the article. Upon information and belief, J.T. actually wrote Rizer's portions of the article, without E.M.'s or RSI's knowledge. On December 5, 2019, Rizer emailed J.T. "[g]ot the paper edited and finally went through – you did a great job. I already bluebook [sic], but can you lightly look and address the few comments there." J.T. then revised the document and returned it to Rizer on January 6, 2020, who held it out as his own.

171.    During the scope of his work with RSI, Rizer repeatedly forwarded emails he received to J.T. for J.T. to provide the actual subject matter expertise that, based upon his credentials, reputation in the field, and the scope of work for which he was employed by RSI, Rizer should have been able to provide himself. In response to these requests, J.T. provided substantive feedback and analysis, which Rizer frequently copied and pasted as his own work product. For example, on December 23, 2020, T.P. contacted Rizer reaching out to him "as an expert on police reform to get [Rizer's] opinion." Instead of providing the analysis requested specifically of him because of his purported credentials, Rizer forwarded the email to J.T., who provided two paragraphs of analysis and a response to T.P.'s question. Rizer then cut and pasted J.T.'s work product and emailed T.P., holding the work product out as his own.

172.    Upon information and belief, J.T.'s expertise is in energy and environmental law. J.T. is not, in fact, a subject matter expert in policing and thus does not possess the credentials or expertise the requestor believed they were receiving from Rizer.

173.    Rizer also repeatedly forwarded emails to J.T. from Rizer's RSI email, relating to the work he diverted from RSI. For example, on July 1, 2020, J.J. emailed Rizer asking for his opinion on an idea she proposed.  Rizer forwarded J.J.'s email to J.T. asking for his opinion, which J.T. provided. Rizer cut and pasted J.T.'s work product and passed it off as his own in his response to J.J.

174.    Based upon Rizer's representations, RSI understood that Rizer was qualified to do the work he was hired to do and was, in fact, doing the work he was hired to do.

175.    Rizer frequently used his RSI email to communicate with J.T., and would cut and paste J.T.'s work product and analysis and pass it off as his own original work.

176.    In this way, J.T. became part of the "team" that Rizer assembled to directly compete with RSI while Rizer was acting as its Director of CJ.

### Dissertation Fraud

177.    In or around 2017, Rizer informed RSI that he was studying to earn a doctorate focused on Criminology and Policing in the United States at Oxford University ("PhD"). Rizer asked RSI to contribute to his tuition at Oxford, which it did. (Note: terminology at U.K. universities differs slightly from American ones. Accordingly, Oxford refers to the PhD instead as "D. Phil").

178.    Since 2017, RSI paid $51,342.10 toward Rizer's PhD studies at Oxford. Payment of these monies by RSI was based on Rizer's representation that he was doing the work and earning the degree himself and that he had the skills, knowledge, and ability to do so.

179.    In addition, RSI funded Rizer's research for his PhD degree through grants and other funding sources since this work fell squarely within the scope of RSI's mission.

180.    As part of his PhD studies, Rizer is required to complete and defend a dissertation. Rizer chose to focus his dissertation on how police view their role and how they can address instances of police violence through recruiting practices, training, and other professional development.

181.    The dissertation has been called, at different points, *Watching the Watchman* or *Takes a Wolf to Catch a Wolf,* and includes multiple parts including, *inter alia*, a research proposal, literature review, methodology, and empirical analysis ("Dissertation Documents").

182.    Rizer represented that he was conducting all research and performing all analysis regarding the drafting of his Oxford dissertation.

183.    Upon information and belief, Rizer determined that he was unable or unwilling to write his own dissertation and perform his own research and analysis in support of his dissertation. Instead, he contracted with multiple sources and paid them to conduct the research and analysis necessary to prepare his dissertation, while intending to claim that he independently prepared his dissertation when, in fact, he did not.

184.    In fact, the Dissertation Documents are based on research and data prepared by RSI employees at RSI's expense.

185.    Had RSI known that Rizer was incapable of or unwilling to do the work himself, RSI would not have paid for Rizer's Oxford tuition or funded the research.

186.    Upon information and belief, Rizer's conduct in hiring others to conduct the analysis and to write his dissertation constitutes academic dishonesty/fraud under Oxford's guidelines. RSI would not have paid for Rizer's Oxford tuition or funded the research if it knew that Rizer would engage in academic fraud.

187.    Upon information and belief, individuals that assisted Rizer with conducting the necessary research and analysis to draft his dissertation include, *inter alia,* J.K. E.M., A.N.R., S.F., D.S., and J.T. ("Rizer Dissertation Team"). Rizer used RSI resources and employees, during regular business hours, to work on his dissertation and conduct research for his personal benefit. Rizer fraudulently induced RSI to enter into contracts with third parties under the guise that they were conducting RSI work when, in fact, they were writing Rizer's dissertation and performing the necessary research and analysis for its completion.

188.    Rizer did not disclose to RSI the fact that he was not performing the work or that he had hired the Rizer Dissertation Team.

189.    Upon information and belief, E.M., an RSI employee Rizer supervised, provided the coding framework to track his research and to be a project manager for his dissertation.

190.    Upon information and belief, RSI paid for the data management system, Quirkos, used by the Dissertation Team for housing and coding the research data.

191.    Upon information and belief, S.F., a former RSI employee, assisted with reviewing the research notes related to Rizer's dissertation and inputting data into Quirkos.

192.    On or about May 13, 2019, RSI entered into an Independent Contractor Agreement with S.F. with a term of May 13, 2019 through December 31, 2019 in the amount of $3,000 ("May 2019 S.F. Agreement"). The scope of work of this agreement included, *inter alia*, development of papers for R Street's grants. More specifically, it stipulated that the contractor would organize police interviews, create text from the interviews, word score, and apply qualitative algorithms. RSI understood that the work done by S.F. under the May 2019 S.F. Agreement related to the deliverables that RSI agreed to provide based on the dissertation research RSI funded.

193.    Rizer also signed the May 2019 S.F. Agreement. Per the S.F. Agreement, RSI owned all work product created by S.F. Specifically, Paragraph 15 of the S.F. Agreement contained a provision regarding "Intellectual Property and Ownership of Work Product" that states:

> Any Work Product developed in the course of or as a result of Contractor's performance of this Agreement, whether by Contractor alone or in collaboration with others, will also be and remain the exclusive property of R Street Institute. R Street will be entitled to all intellectual property and other proprietary rights including but not limited to patents, copyrights, and trademarks with regard to such Work Product. Contractor waives any rights, including intellectual property rights, in all Work Product, and will not distribute or make any other use of Work Product outside R Street without R Street's express written authorization.  Contractor hereby assigns to R Street Institute all right, title and interest in any Work Product, and agrees to execute and deliver to R Street any additional documents that may be necessary to effectuate such assignment . . . With express written consent

> from R Street Contractor may publishing [sic] portions of the final product in academic or other noncompeting publications. Contractor will inform R Street Institute in a timely fashion of any derivative works produced under this Agreement.

194.    On or about May 4, 2020, RSI entered into another agreement with S.F. with a term of May 4, 2020 through October 31, 2020 in the amount of $4,600 ("May 2020 S.F. Agreement"). The scope of work for this agreement included, *inter alia*, transcribing elite interview notes and organizing data and information on police research. This contract also uses the same language as the May 2019 clause in reference to Intellectual Property.

195.    Rizer also signed the May 2020 S.F. Agreement.

196.    A.N.R. is a data scientist who holds a Master's degree in politics from the University of Oxford. Upon information and belief, A.N.R. is also working on his doctorate at Oxford.

197.    Rizer repeatedly represented to RSI that it needed to retain A.N.R. to conduct work on RSI deliverables. Based upon this representation, RSI contracted with A.N.R. on at least three separate occasions. Although RSI understood from Rizer that A.N.R. would be working on RSI deliverables, in reality, A.N.R. was working on Rizer's dissertation, guiding Rizer through different research methods, formulating the methodology, and conducting data analysis.

198.    At all relevant times, the parties intended for RSI to have ownership rights over the dissertation research it funded. Indeed, with Rizer's knowledge and agreement, RSI contracted with various donors to provide deliverables based on Rizer's dissertation research.

199.    On or about May 9, 2019, RSI entered into an Independent Contractor Agreement with A.N.R. with a term of May 1, 2019 through December 1, 2019 in the amount of $15,000 ("May 2019 A.N.R. Agreement"). Its scope of work included, *inter alia*, interviewing police officers pertaining to how they think about their role in controlling violence, analyzing interview

data to perform mixed methods analysis, performing qualitative and quantitative analysis, summarizing and reporting results and findings, co-designing and drafting research methodologies, and writing papers on police violence. RSI understood that the work done by A.N.R. under the May 2019 A.N.R. Agreement related to the deliverables that RSI agreed to provide based on the dissertation research RSI funded.

200.    Per the May 2019 A.N.R. Agreement, RSI owned all work product A.N.R. created. Specifically, the agreement provided: "All work product created by Contractor [A.N.R.] under this Agreement (the "Work") shall be the sole property of R Street Institute."

201.    Rizer also signed the May 2019 A.N.R. Agreement.

202.    On or about May 13, 2020, RSI entered into another agreement with A.N.R. with a term of May 11, 2020 through December 31, 2020 in the amount of $14,000.00 ("May 2020 A.N.R. Agreement").  The scope of work for this agreement included, *inter alia,* researching police attempts to control violence through internal controls, assisting with police officer interviews on their role in controlling violence, performing analysis, and reporting findings. RSI understood that the work done under the May 2020 A.N.R. Agreement related to the deliverables that RSI agreed to provide based on the successful completion of the dissertation research RSI funded.

203.    Per the May 2020 A.N.R. Agreement, RSI owned all work product A.N.R. created. Specifically, the agreement provided:

> Any Work Product developed in the course of or as a result of Contractor's performance of this Agreement, whether by Contractor alone or in collaboration with others, will also be and remain the exclusive property of the R Street Institute.  R Street will be entitled to all intellectual property and other proprietary rights including but not limited to patents, copyrights, and trademarks with regard to such Work Product.  Contractor waives any rights, including intellectual property rights, in all Work Product, and will not distribute or make any other use of Work Product outside R Street without R Street's express written authorization.  Contractor hereby assigns

to the R Street Institute all right, title and interest in any Work Product, and agrees to execute and deliver to R Street any additional documents that may be necessary to effectuate such assignment.

204.    Rizer also signed the May 2020 A.N.R. Agreement.

205.    Rizer convinced RSI to enter into the May 2019 A.N.R. and the May 2020 A.N.R. Agreements under the guise that the work was in furtherance of RSI deliverables. Upon information and belief, the money RSI paid to A.N.R. actually compensated A.N.R. for conducting the data analysis for Rizer's dissertation and to ghostwrite and/or edit parts of the dissertation.

206.    RSI owns all work product conducted by A.N.R.

207.    Upon information and belief, Rizer induced people to work on his dissertation by characterizing it as a book or books, and promising co-authorship rights and the potential for future royalties.

208.    D.S. is a former employee of RSI who left RSI to study abroad. D.S. started working at RSI as a Fellow in January 2016, shortly after graduating from college.

209.    In 2017, after Rizer joined RSI, Rizer told D.S. that he wanted to co-author a book with him as part of D.S.'s work with RSI. Rizer told D.S. that D.S. would be responsible for the literature review and that Rizer would handle the field work and analysis. Rizer promised D.S. that he would receive royalties on the book. D.S. thought this was an incredible opportunity for someone at his level (just out of college) and agreed to co-author the book.

210.    D.S. understood that his work in co-authoring the book was part of his job with RSI.  D.S. thought that RSI knew that he was co-authoring the book with Rizer. RSI did not know that Rizer had made this request of D.S.

211.    D.S. knew that Rizer was working on his doctoral dissertation at Oxford.  Rizer told D.S. that the book was separate from the dissertation.

212.    From the very beginning, however, as D.S. worked on this "book project" for RSI, in actuality he was unwittingly developing the dissertation proposal, outline, and all related documents. Moreover, he believed he was doing so with Oxford's support and feedback. Accordingly, D.S. did all of the analysis and responded to feedback from Oxford – not Rizer. For example, on June 7, 2018, after D.S. provided Rizer with a bibliography, Rizer responded: "One item I wanted your advice over is Ben's comment . . . Do you know what he is talking about – I don't really get it."

213.    In response, D.S. revised the bibliography noting: "Prof. Bradford's question is a great one, a very important point, too," which demonstrates that D.S. was the one learning and digesting the subject matter of the dissertation – not Rizer. This type of back and forth repeated itself over the following years with D.S. ghostwriting, Rizer passing the work off to Oxford as his own, and returning Oxford's feedback to D.S. for analysis and response.

214.    Throughout the duration of his employment with RSI, D.S. continued to work with Rizer on the "book," drafting significant portions including, *inter alia,* the research proposal, methodology development, literature review, initial outline, and bibliography. D.S. understood that the title of the "book" would be *Watching the Watchmen*.

215.    Rizer promised to take D.S. to Oxford to meet the professors who were allegedly supporting their "book."  He never did.

216.    On June 9, 2018, Rizer told D.S.: "You are a badass. This is going to be great – I already have a book publisher interested." Upon information and belief, there was no publisher and this representation was made to encourage D.S. to continue working on the "book."

217.    D.S. spent considerable RSI hours working on the book he was purportedly co-writing with Rizer. Rizer often told D.S. that he was trying to get RSI to pay D.S. more money but

that RSI refused to do so. Rizer told D.S. that since RSI would not pay D.S. more, Rizer would take money from his own compensation to pay D.S. bonuses for his work. Upon information and belief, Rizer gave D.S. several "bonuses" for D.S.'s work on the book. RSI did not know about the "book" or the "bonuses."

218.   Rizer was not D.S.'s supervisor and worked in a different department. RSI is unaware of any attempts by Rizer to advocate that D.S. should receive a raise or bonus from RSI, and RSI never entered into an arrangement for Rizer to provide additional bonuses to any staff, including D.S.

219.   In or about August 2019, D.S. left RSI to study abroad.

220.   On or about September 3, 2019, Rizer emailed D.S. letting him know that he was putting him on an RSI contract that would be titled "Police Diversion" to be funded by RSI. Unbeknownst to D.S. or RSI, Rizer's intended purpose of this contract was for D.S. to continue writing Rizer's dissertation, at RSI's expense. Rizer did not disclose this plan to RSI.

221.   D.S. did not know that this proposed contract was a guise for him to continue writing Rizer's dissertation and instead understood that he would be performing work for RSI.

222.   In or about September 2019, Rizer intentionally misrepresented to RSI that its CJ Program needed help in producing certain RSI deliverables. When RSI asked about the intended deliverables, Rizer represented that D.S. would be working on a white paper for one of RSI's grants and some op-eds, as well as helping to run analytics when Rizer finished his data collection.

223.   Based upon Rizer's representation, on or about September 23, 2019, RSI entered into a contract with D.S.  ("D.S. Agreement").  Rizer also signed the D.S. Agreement.

224.   The term of the D.S. Agreement ran from September 18, 2019 through March 31, 2021 in the total amount of $7,000.

225.     Rizer put together the scope of work for the D.S. Agreement which included, *inter alia,* supporting the development of white papers, conducting extensive research, assisting in the development of op-eds and other content, review and analysis of data, and any other related assignments as agreed to in writing ("D.S. Scope of Work").

226.     RSI understood that the D.S. Scope of Work was limited solely to work for RSI and not for work performed for Rizer personally.

227.     D.S. did not do the work described by Rizer in the D.S. Agreement. Instead, he continued working on "the book" he believed he was writing with Rizer.

228.     RSI did not know that Rizer's purpose in having RSI contract with D.S. was to pay D.S. to write Rizer's Oxford dissertation and engage in academic fraud.

229.     Per the D.S. Agreement, RSI owned all work product created by D.S.  Specifically, Paragraph 15 of the D.S. Agreement contained a provision regarding "Intellectual Property and Ownership of Work Product" that states:

> Any Work Product developed in the course of or as a result of Contractor's performance of this Agreement, whether by Contractor alone or in collaboration with others, will also be and remain the exclusive property of R Street Institute. R Street will be entitled to all intellectual property and other proprietary rights including but not limited to patents, copyrights, and trademarks with regard to such Work Product.  Contractor waives any rights, including intellectual property rights, in all Work Product, and will not distribute or make any other use of Work Product outside R Street without R Street's express written authorization.  Contractor hereby assigns to R Street Institute all right, title and interest in any Work Product, and agrees to execute and deliver to R Street any additional documents that may be necessary to effectuate such assignment . . . With express written consent from R Street Contractor may publishing [sic] portions of the final product in academic or other noncompeting publications. Contractor will inform R Street Institute in a timely fashion of any derivative works produced under this Agreement.

230.     Rizer also offered to make D.S. an RSI Fellow during the contract period, as further inducement for him to do the work. The RSI Fellowship led RSI and D.S. to believe the work D.S. was conducting was for RSI.

231.     On October 3, 2019, Rizer emailed D.S. asking for a timeline on the "Oxford stuff," noting: "I REALLY want to have my draft ready for my professors by next October." Although D.S. was aware that there was some relationship between the "book" and Oxford, he was unaware that the "book," the dissertation, the work for Oxford, and the work for RSI were, in fact, conflated together in Rizer's representation to him. In this way, Rizer effectively tricked D.S. into writing his dissertation for him.

232.     Writing Rizer's dissertation negatively impacted D.S.'s ability to meet the deadlines for his own course of study, requiring him to take a leave of absence from and postpone these studies, believing he was under contract to complete the deliverables Rizer continued to pressure him to produce. On January 27, 2020, D.S. notified Rizer that he had fallen behind on his own academic studies and after catching up, he would respond to Rizer's inquiries. Rizer responded: "Did you get paid from R Street?"

233.     On February 6, 2020, Rizer emailed D.S. noting, "with 5 weeks until I present where I am to my Oxford peeps I want to ensure we are moving. I might have more money for you if you want to continue the work after this project wraps up."  D.S. again explained that he needed to focus on his own academics noting, "it's been a very difficult situation."

234.     On March 24, 2020, Rizer emailed D.S. again: "Wanted to check in on you and see how things were coming with our project. I am moving into the stage of starting to put a draft together – I would like to turn in a draft this October. Moreover I have to turn in two chapters to

progress – I was going to turn in the lit review chapter and the methods chapter (I am writing that now but need the city stuff to finish it)."

235.    D.S. was writing the "lit review chapter" and selecting the cities of study for Rizer's research. Upon information and belief, others on the Rizer Dissertation Team were actually writing the "methods chapter" Rizer claimed to be writing himself, including J.T. and A.N.R. RSI paid for A.N.R.'s work through the various contracts it had with A.N.R.

236.    On March 26, 2020, D.S. provided a status to Rizer. On March 31, 2020, Rizer responded: "I think I can make May 10 work. It's hard to move to the next stage of drafting my sections on the data I collected and my methods chapter until I know what the final lit review will look like and the final city selection sections."

237.    On April 8, 2020, Rizer emailed D.S. stating: "I am all set for the May 10 timeline you set out. The entire project is rolling on that timeline so please let me know if you need help ensuring we keep that deadline." Upon information and belief, the "entire project" was Rizer's dissertation, though D.S. understood it was "the book."

238.    On April 29, 2020, Rizer emailed D.S.: "Just seeing if you need any support to meet the May 10 date. I am basing my other work on this so if you need any support please do not hesitate to ask. The two products is [sic] 1) turning the Part A and B into a [sic] up to date and current lit review and 2) the cite [sic] selections for the 3 cities."

239.    RSI unwittingly paid for these products believing that D.S. was actually performing the work set forth in the D.S. Agreement.

240.    During this time period, Rizer relied upon others to develop the research methodology and gather research data for the target locations for his research, which were determined to be Montgomery, Alabama; Los Angeles, California; and Miami, Florida. RSI

employees conducted the research to support these target locations and provided the information to E.M, as the project manager. E.M. performed this work during business hours, using RSI resources.

241.    On May 11, 2020, Rizer emailed D.S.: "Just checking that you will be able to send me the final deliverables tomorrow?"

242.    On May 15, 2020, D.S. sent two documents to Rizer: (1) Literature Review and (2) Watching the Watchmen – Bibliography.

243.    That same day, Rizer emailed E.M. and A.N.R. passing D.S.'s work off as his own work product and asking them to edit the document stating: "This is WAY toooo long and I am not done – I am going to have to edit the shit out of this later. But wanted you to see where I am going with my first chapter of the book."

244.    On May 25, 2020, Rizer emailed a revised version of D.S.'s literature review to E.M. and A.N.R. asking for edits.

245.    Rizer responded the same day noting the need for additional work from D.S. including, *inter alia,* "the Montgomery cite [sic] selection work." Rizer provided a new timeline for new deliverables for "the book" of "(1) finish Montgomery by May 22 (one week) (2) Finish the rest of the draft part by June 12 (one month)."  Rizer reminded D.S. that he only had "100,000 [words] max and we are at 26,000 so please keep that in mind as you work on these other parts."

246.    While Rizer was pressuring D.S. to stop his own studies to write Rizer's dissertation, he continued to promise that they were writing a book together, often raising the possibility that two separate books may come out of D.S.'s efforts.

247.    On May 22, 2020, D.S. provided Rizer with the updated literature review. Rizer responded: "So your last step is to complete the lit review by June 12 - at that point I will support you billing R Street for the rest of your contract."

248.    After D.S. provided the deliverables, Rizer ceased communicating with him, despite the fact that, in an email dated April 15, 2019, he told D.S. he was "one of my best friends."

249.    Although Rizer promised D.S. that he would approve payment through RSI, Rizer never requested RSI to pay D.S. the amounts owed under the contract.

250.    RSI unwittingly paid for significant aspects of the work performed by D.S. on Rizer's dissertation. Per the D.S. Agreement, RSI therefore owns the intellectual property rights to all work products prepared by D.S.

251.    In June 2020, Rizer entered into a contract with J.T. for J.T. to write the chapters of the dissertation relating to analysis of the empirical data. Per this Agreement, Rizer proposed paying J.T. at least $7,000.00. Upon information and belief, Rizer did not disclose to J.T. that this was his dissertation but instead told him he was "basically helping [Rizer] write a full book" and agreed to pay 10% of the royalty profits. Upon information and belief, this was the same "book" Rizer was purportedly writing with D.S. The scope of work was: "helping me take my field research numbers – analysis I am doing of said data and getting it organized into chapters." Upon information and belief, Rizer paid J.T. at least $10,000 to write the empirical research section of his dissertation.

252.    A.N.R. was responsible for providing the validation methods for coding, providing early reporting of data structures and ideas, developing data visualization of FTO interviews, and completing data visualizations of elite interviews. In addition, A.N.R. repeatedly edited the draft

documents Rizer forwarded to him for review that were part of the dissertation. RSI paid A.N.R. for all work relating to the dissertation under the guise that this was work on RSI deliverables.

253.    On August 1, 2020, Rizer acquired a license to Quirkos software, using RSI's corporate credit card, for housing and coding research data. Rizer represented that the software was for two RSI grants with the note "coding program for police data project."

254.    On August 21, 2020, E.M. also acquired a license to Quirkos software using RSI's corporate credit card, for housing and coding research data. E.M. noted that the software was for an RSI grant with the note "software for policing coding."

255.    Upon information and belief, these Quirkos licenses were actually procured for the purposes of Rizer's dissertation research.

256.     On or about November 4, 2020, Rizer paid J.T. a $2,000 "Oxford work bonus" from his own funds.

257.    RSI paid for Rizer's research, the data he developed from his research, and the software housing and coding the research. As this work was done during Rizer's employment with RSI and paid for using RSI funds, RSI therefore owns this information.

258.    RSI also paid for the contractors (purportedly retained to work on RSI deliverables) who were actually writing Rizer's dissertation. Per those agreements, RSI owns the intellectual property rights to the Dissertation Documents.

259.    Upon information and belief, Rizer himself wrote very little—if any—of the dissertation.

### Rizer's Termination

260.    Beginning in the Spring/Summer of 2019, the CJ Department staff appeared to RSI leadership to be entirely overworked for the amount of deliverables RSI was contracted to provide

to its donors. RSI investigated and could not determine why there was a disconnect because the resources RSI provided should have enabled the work to be thoroughly conducted, without staff having to work overtime or on weekends. RSI carefully reviewed workflows, timesheets, resource allocations, and budgets to troubleshoot this issue.

261.    Rizer consistently acted as an impediment to this process. For example, in order to address the workflow issues in the CJ Department, RSI attempted to hire a project manager for that department in September 2019 that would have reported to Rizer's supervisor. Rizer opposed this idea and continually battled with RSI to have this position placed under his supervision in CJ.

262.    Upon information and belief, this was an attempt by Rizer to thwart any additional oversight that might have exposed his unlawful conduct.

263.    In November 2019, RSI hired a new head of policy.

264.    In December 2019, Rizer notified his new supervisor that bandwidth was limited and his team needed more capacity.

265.    In response, in January 2020, his new supervisor restarted the project manager search. It ultimately did not yield appropriately qualified candidates and thus the job description was revised and re-posted in February 2020.

266.    During this period, Rizer requested a meeting with other departments to better understand internal processes. In the lead up to and through the resulting discussions, it was evident Rizer was confused regarding basic project management practices and financial management.

267.    When asked by his supervisor on March 20, 2020, whether he wanted to continue the hiring process, Rizer responded that it was wise to pause the effort since his team was sufficiently staffed given contractor arrangements, and the fact that the pandemic had grounded travel, which allowed his team time to complete their work.

268.    When the issue of workload management and capacity did not subsequently improve, RSI placed Rizer on a Performance Improvement Plan, aimed at improving the workflows and his leadership of the CJ department. RSI now understands that the workflow issues resulted from the burdens being placed on the RSI staff as a result of Rizer's Side Work.

269.    During the fall of 2020, RSI began having serious concerns regarding the validity of Rizer's research methodologies, the authenticity and originality of his work product, and his business practices. In short, RSI began doubting that Rizer was actually doing or writing the RSI deliverables he passed off as his own work product, and became concerned that he had neither the skills or experience he claimed to possess.

270.    RSI already had concerns regarding Rizer's management and leadership of the CJ Department, as he had repeatedly sought to isolate his team from the organization and to tightly control the flow of information between his department and the organization. This created an "us vs. them" mentality with regard to the CJ Department's view of RSI leadership. At the time, however, RSI did not know the depth of the damage Rizer intentionally caused through his unlawful conduct and deception.

271.    RSI employees could not have been expected to realize that the various work Rizer was assigning was not for RSI deliverables because the Rizer Side Work fell squarely within the scope of RSI's mission and the work RSI would typically conduct. In this way, Rizer unjustly benefited from using RSI's resources and employees—to their detriment.

272.    At the same time Rizer was overworking and stressing RSI employees by demanding that they perform work benefiting Consulting and/or him personally, he routinely represented to them that they were underpaid by RSI and that he was advocating for raises that RSI refused to pay.  This was patently false.

273. After receiving repeated concerns regarding Rizer including, *inter alia,* the integrity of his unfinished dissertation and its research methodology, his program management abilities, and his behavior toward other departments and RSI leadership, RSI made the decision to terminate Rizer. At the time, it did not yet have knowledge of Rizer's rampant fraud and gross breaches of his duty of loyalty to RSI because Rizer intentionally took steps to conceal this conduct.

274. On January 11, 2021, RSI notified Rizer that his employment with RSI was terminated but allowed him the opportunity to resign, which he elected to do.

275. Rizer purposefully misled RSI staff about the reason for his termination in an effort to gain allies and encourage staff to leave RSI. For example, Rizer told RSI employees that he resigned because his request for raises for his staff were refused. This statement is completely false.

276. Within days of his termination, RSI became aware that Rizer had been diverting revenue from RSI and using RSI resources to conduct his Side Work.

**Post-Termination Actions to Harm RSI**

277. Rizer is now working as the Vice President for Technology, Criminal Justice and Civil Liberties at another organization. Former RSI employee, Z.G., is the Head of Policy at this same organization.

278. Upon information and belief, in mid-February 2021, Z.G. organized a Zoom event with at least 12 attendees, some of whom work in the criminal justice policy field. During that video call, Rizer stated that he quit RSI because it is a "sinking ship." In addition, Rizer told the attendees that RSI was shutting down the criminal justice program and closing that shop. These statements were patently false.

279.    Rizer made these false statements with knowledge that they were false and with the intention of harming RSI's reputation, diminishing RSI's market share, and driving business away from RSI.

280.    In addition, Rizer instructed RSI employees to tell RSI donors that he owns the policing research and that RSI could no longer produce deliverables based on that research. That too is patently false, as RSI owns all rights to the data and Dissertation Documents.

281.    Upon information and belief, Mr. Rizer is attempting to use RSI's policing data to divert donors from RSI to his new employer, and to promise deliverables for data and work product that belongs to RSI.

## COUNT 1: BREACH OF DUTY OF LOYALTY

282.    RSI repeats and realleges the facts set forth in Paragraphs 1through 280 as though fully set forth herein.

283.    As the Director of CJ, Rizer held a position of trust and leadership.

284.    As the Director of CJ, Rizer owed RSI a duty of loyalty.

285.    The duty of loyalty required Rizer to act solely for the benefit of RSI in all matters within the scope of his employment, avoiding all conflicts between his duty to RSI and his own self-interest.

286.    The duty of loyalty required Rizer to refrain from actively competing with RSI for donors and to exert his best efforts on behalf of RSI.

287.    The duty of loyalty prohibited Rizer from competing with RSI during his employment with RSI.

288.    During his employment with RSI, Rizer actively competed with RSI.

289.     During his employment with RSI, Rizer diverted business opportunities away from RSI for his personal financial benefit.

290.     During his employment with RSI, Rizer used RSI time, resources and employees to perform the Side Work he diverted from RSI, to compete with RSI, and to benefit financially.

291.     Rizer purposefully misled RSI staff about why RSI purportedly could not contract with third parties.

292.     Rizer pressured RSI employees he supervised to work on his Side Jobs.

293.     Rizer instructed RSI employees not to disclose his Side Jobs.

294.     Rizer usurped corporate opportunities for his own self-interest.

295.     RSI was damaged by Rizer's conduct.

## COUNT 2: TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS AND PROSPECTIVE RELATIONSHIPS

296.     RSI repeats and realleges the facts set forth in Paragraphs 1through 295 as though fully set forth herein.

297.     RSI had a strategic plan that included work in the same space Rizer entered while he was working for RSI.

298.     RSI was actively working to develop relationships with other entities including, *inter alia*, Organizations A through E.

299.     In his role as Director of CJ, Rizer was involved in developing relationships and trying to procure contracts with these entities including, *inter alia*, Organizations A through E.

300.     In his role as Director of CJ, Rizer knew of RSI's business relationships with donors and potential donors.

301.     RSI expected to enter into business relationships for funding with those entities including, *inter alia,* Organizations A through E.

302.    Rizer was involved in and knew of RSI's expectations.

303.    Rizer intentionally interfered with these business opportunities and diverted the business away from RSI for his own benefit.

304.    Upon information and belief, Defendants purposely misled prospective donors about RSI including, *inter alia*, telling prospective donors that RSI would not contract with them if they did not pay overhead.

305.    Defendants engaged in fraudulent conduct to steer donors away from RSI including, *inter alia*, telling them he could save them money by charging his travel to RSI for other matters.

306.    Defendants purposely misled prospective donors by holding themselves out as capable of performing the work Rizer diverted from RSI and then using RSI employees and resources to perform the work.

307.    Rizer purposely misled RSI by telling RSI that it needed to hire A.N.R. to perform an RSI deliverable in order to personally profit from this work.  In reality, Rizer and RSI performed most of the work and A.N.R. paid to Rizer some or all of the monies he received from RSI. RSI therefore lost the revenue from this deliverable that RSI staff actually performed.

308.    Defendants, with knowledge of RSI's donors and potential donors, provided competing services to those donors and potential donors, during his employment.

309.    Rizer, through his position as RSI Director of CJ, was contacted by potential donors to perform work that fell squarely within his role at RSI. Rizer breached his duty of loyalty and diverted the opportunities away from RSI for his own benefit.

310.    Absent Defendants' misconduct, RSI would have realized those business opportunities.

311.    RSI was damaged by Defendants' unlawful conduct.

## COUNT 3: MISAPPROPRIATION OF TRADE SECRETS (Defend Trade Secrets Act, 18 U.S.C. §1836, *et seq.*)

312.    RSI adopts and incorporates the allegations set forth in paragraphs 1 through 311 as though fully set forth herein.

313.    Through his position as Director of CJ, Rizer had knowledge of and access to RSI trade secret information including, *inter alia*, its donor lists, targeted prospective donors, RSI policy priorities, initiatives and contacts, pricing methods, programs, and processes ("Trade Secrets").

314.    These Trade Secrets have independent economic value, are not known or readily ascertainable by proper means, and were subject to reasonable efforts by RSI to maintain in confidence.

315.    Defendants misappropriated these Trade Secrets to obtain a business advantage and to compete with RSI, while Rizer was still employed by RSI. For example, Rizer provided trade secrets in the form of an overview of RSI's prioritization of state policy targets and RSI's connections to them to Organization B. Defendants misappropriated RSI's trade secrets and used RSI resources to secure more work from Organization B for their benefit. Moreover, Rizer and J.K. took no steps to safeguard this confidential information from further publication.

316.    Upon information and belief, Rizer is misappropriating the Dissertation Documents, which include RSI's confidential data and unpublished work product in order to divert work from RSI and gain a competitive advantage. RSI has not authorized this disclosure or use.

317.    Defendants used and continue to use RSI's confidential and trade secret information relating to calculation of overhead, proposal language, pricing information and other business information, and used that information to get a business advantage.

318.    Rizer knew what products and deliverables RSI had and used that knowledge to sell those same deliverables to other entities in his Side Work, personally benefiting from RSI's work product.

319.    RSI's Trade Secrets have independent economic value because they are not generally known and are not readily ascertainable through proper means.  RSI has spent significant time and devoted substantial resources to developing this information, and through it, RSI is able to operate and grow its business in a way that is difficult for its competitors to duplicate. RSI has taken reasonable measures to keep this confidential information secret, including by securing the data on its networks.

320.    Defendants utilized these Trade Secrets in their Side Work by relying on them to get a business advantage through pricing, methods, and services offered.

321.    Rizer deliberately misappropriated RSI's Trade Secrets with intent to use that information for his own benefit and to unfairly compete against RSI, his employer. His misappropriations were willful and malicious. Upon information and belief, Rizer continues to use them today with his new employer.

322.    As a result of these improper misappropriations, Defendants have not only caused substantial harm to RSI, but have unjustly enriched themselves.

323.    Defendants' actual and threatened misappropriation of Trade Secrets is causing RSI to suffer irreparable harm including, *inter alia,* loss of customers, loss of reputation and customer good will, and loss of the investment in its Trade Secrets. This harm cannot be adequately remedied at law and requires injunctive relief.

324.    As a result of Defendants' improper misappropriation, disclosure and use of RSI's Trade Secrets, they have violated the Defend Trade Secrets Act.

325.     This Court is authorized to enjoin the actual or threatened misappropriation of a trade secret related to a service used in, or intended for use in, interstate commerce.

326.     Because of Defendants' misappropriation, RSI is entitled to recover monetary damages in an amount to be determined at trial for Defendants' unjust enrichment and RSI's actual losses, as well as punitive and exemplary damages of twice the amount of damages for any actual loss and any unjust enrichment.  In addition, RSI is entitled to recover its attorney's fees.

327.     RSI does not have an adequate remedy at law. Should this Court fail to enter the injunctive relief RSI requests, RSI will be unable to repair the damage done to its confidential information, business relationships and reputation, and it will lose the competitive advantage it has worked hard to establish.

## COUNT 4: VIOLATIONS OF THE VIRGINIA UNIFORM TRADE SECRETS ACT
### (Va. Code §59.1-335, *et seq.*)

328.     RSI repeats and realleges the allegations contained in paragraphs 1 through 327 as though fully set forth herein.

329.     Through his position as Director of CJ, Rizer had knowledge of and access to RSI trade secret information including, *inter alia*, its donor lists, targeted prospective donors, pricing methods, programs and processes ("Trade Secrets").

330.     These Trade Secrets have independent economic value, are not known or readily ascertainable by proper means, and were subject to reasonable efforts by RSI to maintain secrecy.

331.     Rizer misappropriated these Trade Secrets to obtain a business advantage and to compete with RSI, while he was employed by RSI. For example, he provided trade secrets in the form of an overview of RSI's prioritization of state policy targets and RSI's connections to them to Organization B. Rizer misappropriated RSI's trade secrets and used RSI resources to secure

more work from Organization B for his benefit. Moreover, Rizer and J.K. took no steps to safeguard this confidential information from further publication.

332. Upon information and belief, Rizer is misappropriating the Dissertation Documents, which include RSI's confidential data and unpublished work product in order to divert work from RSI and gain a competitive advantage. RSI has not authorized this disclosure or use. Defendants used and continue to use RSI's confidential and trade secret information relating to calculation of overhead, pricing information and other business information and used that information to get a business advantage.

333. Defendants used and continue to use RSI's confidential and trade secret information relating to calculation of overhead, proposal language, pricing information and other business information and used that information to get a business advantage.

334. Defendants knew what products and deliverables RSI had and used that knowledge to sell those same deliverables to other entities in Rizer's Side Work, personally benefiting from RSI's work product.

335. RSI's Trade Secrets have independent economic value because they are not generally known and are not readily ascertainable through proper means. RSI has spent significant time and devoted substantial resources to developing this information, and through it, RSI is able to operate and grow its business in a way that is difficult for its competitors to duplicate. RSI has taken reasonable measures to keep this confidential information secret, including by securing the data on its networks.

336. Rizer utilized these Trade Secrets in his Side Work by relying on them to get a business advantage through his pricing, methods, and services.

337.    Rizer deliberately misappropriated RSI's Trade Secrets with intent to use that information for his own benefit and to unfairly compete against RSI, his employer. His misappropriations were willful and malicious. Rizer continues to use them today with his new employer.

338.    As a result of their improper misappropriations, Defendants have not only caused substantial harm to RSI, but have unjustly enriched themselves.

339.    Defendants' actual and threatened misappropriation of Trade Secrets is causing RSI to suffer irreparable harm including, *inter alia,* loss of customers, loss of reputation and customer good will, and loss of the investment in its Trade Secrets. This harm cannot be adequately remedied at law and requires injunctive relief.

340.    As a result of Defendants' improper misappropriation, disclosure and use of RSI's Trade Secrets, they have violated the Virginia Uniform Trade Secrets Act.

341.    This Court is authorized to enjoin the actual or threatened misappropriation of a trade secret related to a service used in, or intended for use in, interstate commerce.

342.    By reason of Defendants' misappropriation, RSI is entitled to recover monetary damages in an amount to be determined at trial for Rizer's unjust enrichment and RSI's actual losses, as well as punitive and exemplary damages of twice the amount of damages for any actual loss and any unjust enrichment. In addition, RSI is entitled to recover its attorney's fees.

343.    RSI does not have an adequate remedy at law. Should this Court fail to enter the injunctive relief RSI requests, RSI will be unable to repair the damage done to its confidential information, business relationships and reputation, and it will lose the competitive advantage it has worked hard to establish.

## COUNT 5: CONVERSION

344.     RSI repeats and realleges the allegations contained in paragraphs 1 through 343 as though fully set forth herein

345.     Defendants used RSI employees and resources for his competing business.

346.     Rizer demanded that RSI staff, who he supervised, perform work for his Side Work using RSI time and resources.

347.     Rizer submitted expenses for costs he incurred in his competing businesses to RSI for reimbursement. Based upon his representation that these were incurred through work for RSI, Rizer was reimbursed for these expenses, thereby taking money that did not belong to him.

348.     Rizer billed time he spent on his Side Work to RSI grants and collected a salary from RSI for his Side Work.

349.     Rizer knew what products and deliverables RSI had and used that knowledge to sell those same or similar deliverables to other entities in his Side Work, personally benefitting from RSI's work product.

350.     Rizer has also converted RSI property: namely, the Dissertation Documents and data for his personal use.

## COUNT 6: FRAUDULENT MISREPRESENTATION/ACTUAL FRAUD

351.     RSI adopts and incorporates paragraphs 1 through 350 as though fully set forth herein.

352.     Rizer repeatedly made false representations, in reference to material facts, intentionally and with knowledge of their falsity, with the intent to deceive RSI. RSI then acted in reasonable reliance on Rizer's representation and suffered damages.

353.     Rizer is an attorney and was the Director of CJ.

354.    RSI relied on Rizer's representations in taking certain actions.

355.    Rizer told RSI that the CJ department needed help and needed to contract with D.S. to conduct RSI work in the CJ Department. Rizer knew at the time he made this representation that it was false and intended to deceive RSI.

356.    Paying someone else to write a dissertation constitutes academic fraud.

357.    Rizer intended for RSI to rely on his representation. RSI did, in fact, rely on Rizer's representation and engaged D.S.

358.    RSI paid D.S. based upon Rizer's representation that D.S. was performing RSI work.

359.    RSI would not have engaged D.S. if it knew that Rizer was using him to commit academic fraud.

360.    RSI would not have paid D.S. to write Rizer's dissertation.

361.    RSI was damaged because of Rizer's fraud.

362.    Rizer told RSI that it needed to retain A.N.R. to work on a specific grant and that A.N.R. would be doing the work.  Rizer knew at the time this statement was made that it was false.

363.    RSI relied upon Rizer's statement and engaged A.N.R.

364.    Based upon Rizer's representation that A.N.R. performed the work, RSI paid A.N.R. Upon information and belief, A.N.R. then paid that money to Rizer.

365.    A.N.R. did not perform the work.

366.    Rizer and A.N.R. schemed to defraud RSI so that Rizer could personally profit.

367.    RSI was damaged by this conduct.

368.    Rizer represented to RSI that he was performing work and completing RSI deliverables.

369.   Rizer represented to RSI that he had the skills and experience to perform the essential functions of his position with RSI.

370.   Rizer knew at the time he made these statements that they were untrue and that he was paying others to perform his work.

371.   RSI reasonably relied upon Rizer's representations and published work with his name on it, and paid Rizer a salary.

372.   Rizer did not complete the work, but instead paid others to do it, while he earned a salary from RSI and had his name attached to the ghostwritten work product.

373.   RSI was damaged by this conduct.

374.   Rizer represented to RSI that he was earning his PhD and that he was conducting his own research and writing his own dissertation.

375.   Rizer represented to RSI that he had the skills and experience to earn his PhD.

376.   Rizer knew at the time he made these statements that he did not have the skills and experience, and that he was not conducting his own research or writing his own dissertation.

377.   RSI reasonably relied upon Rizer's misrepresentations, paid for his Oxford tuition, and funded his research.

378.   RSI was damaged by this conduct.

**<u>COUNT 7: NEGLIGENT MISREPRESENTATION/CONSTRUCTIVE FRAUD</u>**

379.   RSI adopts and incorporates paragraphs 1 through 378 as though fully set forth herein.

380.   Rizer made repeated false representations of material fact negligently, with the intent that RSI would act on his representations. RSI did, in fact, justifiably rely upon Rizer's representations and was damaged as a result thereof.

381.   Rizer negligently communicated false information to RSI.

382.   Rizer intended or should have recognized that RSI would likely be imperiled by action taken in reliance upon the misrepresentations.

383.   RSI reasonably relied upon the false information to its detriment.

384.   RSI was damaged by Rizer's conduct.

## COUNT 8:  BUSINESS CONSPIRACY (Virginia Code §18.2-499)

385.   RSI adopts and incorporates paragraphs 1 through 384 as though fully set forth herein.

386.   As the Director of CJ, Rizer owed a fiduciary duty to RSI, including a duty of loyalty.

387.   Defendants conspired with others, as set forth in detail herein, to misappropriate and disclose Trade Secrets, divert revenue and business opportunities from RSI, commit academic fraud, and injure RSI's business and reputation.

388.   Defendants conspired with J.K to divert business away from RSI, their employer, to conceal their unlawful conduct, and to personally profit from their unlawful conduct. Defendants and J.K. acted intentionally, purposefully and without lawful justification.

389.   Defendants conspired with J.K. to misappropriate and disclose RSI Trade Secrets; to trade on RSI's brand, trademark and reputation; and to use RSI resources and employees to perform their Side Work, convert RSI's property, and damage RSI. Defendants and J.K. acted intentionally, purposefully and without lawful justification.

390.   Rizer conspired with A.N.R. to defraud RSI into contracting with A.N.R. under the guise that A.N.R. was performing a deliverable in order to divert RSI revenue to Rizer. Rizer and A.N.R. acted intentionally, purposefully and without lawful justification.

391.   Rizer conspired with A.N.R. to defraud RSI into contracting with A.N.R. under the guise that A.N.R. was producing RSI deliverables so that RSI would pay A.N.R. to commit academic fraud, perform the dissertation research and analysis, and ghostwrite parts of Rizer's dissertation. Rizer and A.N.R. acted intentionally, purposefully and without lawful justification in perpetrating this fraud.

392.   Rizer conspired with J.T. to defraud RSI into thinking Rizer was capable of performing and, in fact, was performing, the essential functions of his job in order to receive compensation from RSI. Rizer and J.T. conspired to defraud RSI by passing off J.T.'s work product as Rizer's so that Rizer's name would be attached and he would be compensated for the work. Rizer and J.T. acted intentionally, purposefully, and without lawful justification.

393.   Rizer conspired with Rizer Consulting, LLC to breach the duty of loyalty Rizer owed to RSI, divert revenue and business from RSI, tortiously interfere with RSI's business relations and opportunities, misappropriate and disclose Trade Secrets, and convert RSI resources and money. Rizer and Rizer Consulting, LLC acted intentionally, purposefully and without lawful justification.

394.   Defendants acted for the purpose of willfully and maliciously injuring RSI, without lawful justification.

395.   RSI was damaged as a result of Defendants' actions.

396.   Defendants acted with malice and an intent to injure RSI.

397.   Upon information and belief, after his termination from RSI, Rizer intentionally acted with the purpose of injuring RSI including, *inter alia*, advising third parties that RSI's criminal justice practice was ending.

398.     Defendants conspired with each other and others, as set forth in detail herein, to injure RSI's business, trade, and reputation by lying to third parties and spreading misinformation about RSI including, *inter alia,* telling third parties and RSI employees that RSI was discontinuing its criminal justice practice. Defendants acted intentionally, purposefully, and without lawful justification.

## COUNT 9:  BREACH OF CONTRACT

399.     RSI adopts and incorporates paragraphs 1 through 398 as though fully set forth herein.

400.     RSI has a valid, binding, and enforceable Conflict of Interest Agreement with Rizer that was a term and condition of his employment as RSI Director of CJ.

401.     Rizer materially and repeatedly breached the terms and conditions of the Conflict of Interest Agreement by engaging in conduct that had a clear conflict of interest to RSI's interests and failing to disclose those conflicts.

402.     On August 4, 2016, RSI offered and Rizer accepted a position as Criminal Justice Director for RSI, an at-will position.  Rizer agreed to write original op-eds and articles, and to produce his own longer-form work. In exchange for this work, RSI agreed to pay Rizer an annual salary of $117,000.00, which increased over time, as well as to provide certain benefits. RSI fully, faithfully and timely performed all obligations owed to Rizer in his at-will employment with RSI.

403.     Rizer materially and repeatedly breached the terms of his at-will employment agreement by passing off other work products as his own and receiving compensation from RSI for purportedly performing his job when, in fact, he was not.

404.     Rizer owed an implied duty of good faith and fair dealing, and a duty of loyalty, as part of his at-will employment agreement with RSI.  Rizer repeatedly breached these duties, which were part of the at-will employment agreement.

405.     RSI was damaged by this conduct.

406.     As a direct and proximate result of Rizer's breaches of the Conflict of Interest Agreement and at-will employment agreement, RSI has suffered and will continue to suffer ongoing injury, including substantial economic harm in the form of damages including, *inter alia,* damage to its relationships with its valued donors, payment of unearned compensation to Rizer, continuing loss of its competitive position, loss of market share, and lost profits.

## COUNT 10: UNJUST ENRICHMENT AND PROMISSORY ESTOPPEL

407.     RSI adopts and incorporates paragraphs 1 through 406 as though fully set forth herein.

408.     RSI conferred a benefit on Rizer, Rizer knew RSI conferred the benefit, and Rizer accepted and retained the benefit under circumstances that render it inequitable for Rizer to retain the benefit without paying for its value.

409.     Beginning in 2017, RSI reimbursed Rizer for his tuition at Oxford University based on his representation that *he* was <u>earning</u> his doctorate in philosophy; that is, that he was actually doing the work. Over the years, RSI has paid Rizer over $50,000.00 for tuition reimbursement.

410.     In addition, based solely upon Rizer's representation that the CJ Department was overworked and needed assistance, RSI paid third parties including A.N.R. and D.S. to conduct work for RSI and prepare RSI deliverables. Upon information and belief, RSI actually paid D.S. and A.N.R. to devise, research, and write Rizer's dissertation.

411.    Rizer also used A.N.R. as a front in an end-run around RSI's rejection of Rizer's request to contract directly with an RSI donor. Rizer represented that A.N.R. was required to perform the work and that the work was "front-loaded."  Based upon this representation, RSI paid A.N.R. $30,000.00 for work A.N.R. did not actually perform. Instead, RSI employees performed this work. Upon information and belief, A.N.R. then turned around and paid to Rizer some or all of the amounts he received from RSI on this contract. This money should have remained with RSI since RSI performed the work.

412.    Rizer actively competed with RSI throughout his employment, unbeknownst to RSI. Not only did Rizer actively compete and conceal this competition, he used RSI resources and staff for his Side Work and charged expenses to RSI, misrepresenting to RSI that these were RSI-incurred expenses. RSI reimbursed Rizer for those expenses and paid the salaries of the employees who worked on Rizer's Side Work.  In addition, RSI paid Rizer's salary when he was not actually working for RSI's benefit and instead was performing Side Work during his RSI working hours.

413.    RSI paid Rizer an initial annual salary of $117,000.00 with the understanding that Rizer was dedicating his full time and attention and <u>actually performing</u> the work. In total, RSI paid Rizer nearly $600,000.00 for his work at RSI. Upon information and belief, Rizer was paying others to do his RSI work, without disclosing this to RSI, acting as a broker for work and keeping a commission.

414.    All of the benefits RSI unwittingly provided conferred a benefit on Rizer.

415.    Under the circumstances, it is unjust and inequitable for Rizer to retain any of the monies that were paid to him or to others on his behalf.  Further, it is unjust and inequitable for Rizer to retain any ownership rights to the Dissertation Documents.

416.    RSI's remedies at law are inadequate to compensate it for the harm caused by Rizer's conduct and his retention of any ownership rights to the Dissertation Documents.

## COUNT 11: DECLARATORY JUDGMENT – OWNERSHIP OF COPYRIGHT OF DISSERTATION DOCUMENTS

417.    RSI adopts and incorporates paragraphs 1 through 416 as though fully set forth herein.

418.    An actual controversy exists regarding the ownership of the copyright to the Dissertation Documents.

419.    At all times relevant, Rizer was an employee of RSI.

420.    Rizer has no ownership rights to the Dissertation Documents.

421.    Any ownership rights and interest in the Dissertation Documents belong to RSI as works for hire, and RSI entered into contracts with—and paid—the third parties who performed the work that provided the intellectual property for the work product. Rizer co-signed these agreements.

422.    Any contributions Rizer made to the Dissertation Documents were minimal and were made as a work for hire for RSI. RSI provided funding and commissioned Rizer's research. In addition, whatever research and writing Rizer actually performed, he conducted during the scope of his employment with RSI and as an RSI deliverable.  This work product therefore belongs to RSI as a work made for hire.

423.    Further, although RSI did not realize at the time that it was paying third parties to conduct research and analysis and to write the Dissertation Documents, it did, in fact, pay these individuals. Per the agreements with those individuals, all work done constituted a work for hire and RSI owns the intellectual property of the same. Rizer co-signed these agreements.

424.    At Rizer's insistence, RSI entered into the D.S. Agreement with D.S. to pay for certain deliverables that Rizer represented as RSI deliverables.

425.    Per the D.S. Agreement, RSI owns all intellectual property and other proprietary rights, including copyrights in all Work Product developed by D.S. in the course of or as a result of D.S.'s performance of the Agreement whether by himself or in collaboration with others.

426.    Rizer signed the Agreement with D.S.

427.    RSI owns the copyright for all work prepared by D.S. for Rizer as part of the Agreement. D.S.'s work under the Agreement constitutes work made for hire and was generated at the instance and expense of RSI.

428.    In addition, RSI funded the research Rizer purportedly did for his dissertation through its own money and through grants. RSI owns all such data.

429.    RSI entered into multiple agreements with A.N.R. Upon information and belief, RSI paid A.N.R. to run data analysis on the dissertation research and to review and revise Rizer's dissertation. Per the Agreements with A.N.R., RSI owns all work product.

430.    RSI is the owner of the copyright in the Dissertation Documents.

431.    Upon information and belief, Rizer is continuing to offer to sell various products and deliverables using some or all of the Dissertation Documents.

432.    Upon information and belief, Rizer persists in referencing his intent to publish a book or books using the Dissertation Documents, and to promise deliverables based upon that work product of RSI's.

433.    RSI has not authorized, permitted or provided consent to Rizer to copy, reproduce, distribute or display the Dissertation Documents.

434.    Rizer's actions will continue unless enjoined by this Court and a declaration regarding ownership is issued.

**COUNT 12:  DECLARATORY JUDGMENT – FREEDOM TO USE DISSERTATION DOCUMENTS**

435.    RSI adopts and incorporates paragraphs 1 through 434 as though fully set forth herein.

436.    An actual controversy exists regarding the ability of RSI to make use of the Dissertation Documents.

437.    At a minimum, and in the alternative to Count 11, RSI is a joint author of the Dissertation Documents. RSI employees and contractors wrote and conducted the vast majority of the Dissertation Documents at the instance and expense of RSI.  At a minimum, then, RSI is a joint author of the Dissertation Documents under the work-for-hire doctrine and/or is the owner of its employees' copyright interests.

438.    RSI has a right to use the Dissertation Documents without interference from Rizer.

439.    RSI's remedies at law are inadequate to compensate for the harm caused by Rizer's attempts to interfere with RSI's use of the Dissertation Documents and his attempts to plagiarize and pass these documents off as his own work product.

440.    Rizer's actions have caused and will cause irreparable harm to RSI and its business opportunities, reputation, and goodwill.

441.    Rizer's actions will continue unless enjoined by this Court and a declaration regarding RSI's right-of-use issues.

**COUNT 13: TRADEMARK INFRINGEMENT (Common Law)**

442.    RSI adopts and incorporates paragraphs 1 through 441 as though fully set forth herein.

443.    RSI owns all right, title, and interest in RSI's trademarks, including R STREET, R



STREET INSTITUTE and, Free markets. Real solutions. (the "RSI Trademarks"), which have been

continuously used in interstate commerce since 2012.

444.    Defendants have made use of the RSI Trademarks in interstate commerce without

RSI's consent. For example, and without limitation, Defendants attached some or all of the RSI

Trademarks to the testimony he provided in Pennsylvania in June 2019, implying that RSI had

knowledge of, supported, and sponsored the legislative testimony.

445.    Defendants' use of the RSI Trademarks was done in an effort to confuse others into

thinking they were acting on behalf of RSI so that they could trade off RSI's name and reputation,

and profit from RSI's name.

446.    Defendants' use of RSI's name and logo is likely to, and in fact did, deceive and

confuse members of the relevant public.

447.    Defendants' unauthorized use of the RSI Trademark creates an erroneous

impression in the minds of consumers.

448.    Unless Defendants are enjoined and restrained from continuing this infringement,

Defendants will continue to confuse consumers and RSI will continue to be injured by the ongoing

infringement. RSI is entitled to injunctive relief to prevent further violation of its rights to the RSI

name and logo.

449.    RSI is entitled to recover Defendants' profits and the actual damages it sustained,

as will be proven at trial. RSI is also entitled to recover the costs of this action.

450.    Because Defendants' misconduct has been intentional and willful, RSI should be awarded three times its actual damages.

### COUNT 14:  TRADEMARK INFRINGEMENT (LANHAM ACT: 15. U.S.C. §1125(a)

451.    RSI adopts and incorporates paragraphs 1 through 450 as though fully set forth herein.

452.    RSI owns all right, title and interest in RSI's trademarks including R STREET, R STREET INSTITUTE and,



(the "RSI Trademarks"), which have been continuously used in interstate commerce since 2012.

453.    Defendants have made use of the RSI Trademarks in interstate commerce without RSI's consent. For example, and without limitation, Defendants attached some or all of the RSI Trademarks to the testimony he provided in Pennsylvania in June 2019, implying that RSI had knowledge of, supported, and sponsored the legislative testimony.

454.    Defendants' use of the RSI Trademarks was done in an effort to confuse others into thinking they were acting on behalf of RSI so that they could trade off RSI's name and reputation, and profit from RSI's name.

455.    Defendants' use of RSI's name and logo is likely to, and in fact did, deceive and confuse members of the relevant public.

456.    Defendants' unauthorized use of the RSI Trademarks creates an erroneous impression in the minds of consumers.

457.    Unless Defendants are enjoined and restrained from continuing this infringement, Defendants will continue to confuse consumers and RSI will continue to be injured by the ongoing infringement. RSI is entitled to injunctive relief to prevent further violation of its rights to the RSI name and logo.

458.    RSI is entitled to recover Defendants' profits and the actual damages it sustained, as will be proven at trial. RSI is also entitled to recover the costs of this action.

459.    Because Defendants' misconduct has been intentional and willful, RSI should be awarded three times its actual damages.

## **PRAYER FOR RELIEF**

WHEREFORE, R Street Institute prays for judgment against Defendants and for the following relief:

a.   Injunctive relief restraining Defendants from acquiring, maintaining, using, and/or disclosing RSI's trade secrets and/or other confidential documents, data, and/or information, and mandating that all copies of the same be accounted for, destroyed, and/or returned to RSI;

b.   Injunctive relief restraining Defendants from using the data, work product, analysis, bibliography, dissertation chapters, and literature review ("Dissertation Documents") that were works for hire and belong to RSI;

c.   Injunctive relief restraining Defendants from using RSI's trademark, name, and logo;

d.   A declaration that Defendants have no ownership interest in the Dissertation Documents;

e.   A declaration that RSI has the sole and exclusive right to use the copyrights to the Dissertation Documents without interference from Defendants;

f.   A declaration that Rizer forfeited any entitlement to equity or ownership in the Dissertation Documents as a result of his breach of the duty of loyalty and his fraud;

g.   Further injunctive relief, including an Order requiring Rizer to execute a written assignment or royalty-free exclusive license to any interests he has in the Dissertation Documents;

h.   Compensatory damages in an amount to be determined at trial but in excess of $100,000.00;

i.   Disgorgement of any profits resulting from work Defendants diverted from RSI;

j.   Disgorgement of any profits resulting from Defendants' use of confidential and proprietary information;

k.   Disgorgement of any profits Defendants earned plus actual damages sustained by RSI as a result of Defendants' unlawful conduct;

l.   Exemplary/punitive damages in an amount to be determined at trial;

m.   Reasonable attorney's fees;

n.   Litigation costs; and

o.   Such other relief as this court may deem just and proper.

## **JURY AND TRIAL DEMAND**

RSI hereby demands a trial by jury with respect to each claim in this Complaint that is so triable.

Dated:  April 1, 2021

Respectfully submitted,

*/s/ Jennifer S. Jackman*
Jennifer S. Jackman, Esq.
Whiteford, Taylor & Preston, L.L.P.
1800 M Street NW, Suite 450N
Washington, D.C. 20036-5869
(202) 659-6800

Steven E. Tiller, Esq.
Whiteford, Taylor & Preston, L.L.P.
7 Saint Paul Street
Baltimore, Maryland 21202

Attorneys for Plaintiff,
R STREET INSTITUTE

*11713120*